[No. H035659. Sixth Dist. Aug. 12, 2011.]

In re the Marriage of MARTIN and ALLI BODO.
MARTIN BODO, Appellant, v.
ALLI BODO, Respondent.

374

## COUNSEL

Dominion Law Group and Kevin S. Hutcheson for Appellant Martin Bodo.

Hoge Fenton Jones & Appel Inc., Kathryn Schlepphorst and Erin Canfield Smith for Respondent Alli Bodo.

## OPINION

**GROVER, J.**\*—In this marital dissolution action, appellant Martin Bodo and respondent Alli Bodo dispute the amount of child support that Martin[1] should pay for their four children. In October 2006, as part of a judicially supervised settlement, the parties stipulated that income of $33,333 per month ($400,000 per year) would be attributed to Martin for the purpose of calculating child support, resulting in a monthly payment of $7,000.

Two years later, Martin moved to modify child support, arguing that his income was substantially reduced and that he was forced to liquidate assets and borrow to pay support. After an evidentiary hearing, the court found that child support under the parties' agreement could not be adjusted downward "absent a substantial change in circumstances," and that, while a substantial change in visitation warranted an adjustment, there was no substantial change

---

\*Judge of the Monterey Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

[1] For clarity, and meaning no disrespect, we will refer to the parties by their first names. (*Rubenstein v. Rubenstein* (2000) 81 Cal.App.4th 1131, 1136, fn. 1 [97 Cal.Rptr.2d 707].)

in Martin's income. The court reduced child support from $7,000 per month to $6,178 per month based on Martin's increased visitation and made orders regarding arrearages.

On appeal, Martin argues the court abused its discretion when it concluded it was bound by the parties' 2006 agreement, which requires proof of a "substantial" change in circumstances to modify support. He contends that modification of an "above guideline" support order requires proof of a "material" change in circumstances, not a "substantial" change, and that the court applied the wrong legal standard. He also argues that the financial effects of a change in timeshare should have been considered in evaluating whether his financial circumstances had changed. We find no abuse of discretion and will affirm the order modifying support.

## FACTS AND PROCEDURAL HISTORY

Martin and Alli were married in 1996 and separated in 2005. They have four children who were ages 13, 12, 10, and 8 at the time of the motion to modify child support.

Martin has a bachelor's degree in nuclear physics and a master's degree in business administration. He is a self-employed entrepreneur; he has created and operated businesses that manufacture electronic devices, hard drives, and computer recording devices. He has 15 issued or pending patents. He is president of Computer Performance, Inc. (CPI), a business he founded in 1987 that builds computerized recording equipment and data storage products. Martin owns 99 percent of the company's stock; his mother owns the other 1 percent. Between 1995 and 2000, Martin also pursued several real estate transactions in partnership with Jamal Keikha, who has worked for Martin since 1988.

Alli completed two years of college and was working toward a bookkeeping certificate at the time of the motion. She did not work outside the home during the nine-year marriage. In 2009, Alli and a partner opened a bath and body products store in San Francisco, which has yet to realize a profit.

In 1998, the parties purchased a four-bedroom house on one acre in Los Altos Hills (hereafter the House). They paid cash for the House and remodeled it to include six bedrooms and an office. They also owned the commercial building where CPI is located (hereafter the Building). CPI leased the Building from Martin, resulting in rental income. The parties owned both properties "free and clear" of any mortgage debt.

Martin filed for dissolution in January 2005 and marital status was terminated in August 2005. Alli and the children moved from the House into

a rental home. Although the record contains little information about child custody issues, it appears that custody and visitation were vigorously litigated.[2]

## I. *Settlement of Property and Support Issues*

Many contested issues were resolved.at a judicially supervised settlement conference before a family law commissioner in October 2006. The parties' agreement was reduced to writing and signed by both parties and counsel. Among other things, the parties agreed that Martin would receive the House, the Building, CPI, and all CPI stock in exchange for an equalizing payment of $2.375 million. The parties had already divided their bank accounts, personal property, vehicles, and airplanes. The parties agreed that jurisdiction to award spousal support would be terminated and that they would pay their own attorney fees.

Martin agreed to pay child support of $7,000 per month starting in November 2006, plus all private school tuition for the children through high school. The parties arrived at the child support figure by attributing monthly income of $33,333 to Martin and $1,170 to Alli, with a "timeshare" of 20 percent to Martin and 80 percent to Alli. They attached an Xspouse[3] calculation to their settlement agreement, setting forth the facts used to calculate the amount of support. The agreement provided that "Borrowing to pay the equalization payment does not constitute a change of circumstances for the calculation of child support, nor does payment of any debt or interest on such debt. It is contemplated that [Martin] will need to borrow to pay the equalizing payment stated in this agreement." The agreement was incorporated into a judgment entered on January 12, 2007.

Alli put the $2.375 million equalizing payment into investment accounts, which produced $100,000 in dividend income in 2007. She later used $1.4 million to buy a house in Sunnyvale.

After Martin sought to reduce child support in October 2007 and Alli sought permission to move with the children to Folsom, California, in March 2008, the parties signed a second written agreement in April 2008, in which Alli agreed to stay in Sunnyvale in exchange for Martin's agreement to

---

[2] At various times, the court appointed a child custody assessor, a parenting coordinator, a psychologist, and a special master. At one point, Martin told the court he spent 10 to 20 hours per week on the dissolution proceedings.

[3] Xspouse is one of the privately developed computer programs used to calculate guideline child support under the formula required by Family Code section 4055. (*In re Marriage of Schulze* (1997) 60 Cal.App.4th 519, 523–524, fn. 2 [70 Cal.Rptr.2d 488] [DissoMaster]; *In re Marriage of Riddle* (2005) 125 Cal.App.4th 1075, 1079 [23 Cal.Rptr.3d 273] [Xspouse].)

continue paying $7,000 per month in child support. That agreement was never made an order of the court.

## II. *Martin's 2008 Request to Modify Child Support*

In December 2008, Martin filed an order to show cause (OSC) requesting modification of child support. He alleged that when child "support was initially set, [his] income was substantially higher (approximately $300,000 per year)" and that his income had dropped to $36,000 the previous year, while his visitation timeshare had increased to about 38 percent. He attached excerpts from his 2007 tax return showing employment income of $21,695 and business losses of $571,084. After other losses and income were factored in, his adjusted gross income was negative $556,259.

Alli opposed Martin's request, arguing it was disingenuous to allege that his income was only $2,277 per month. She stated that at the time of the parties' 2006 agreement, although Martin's reported taxable income was $1,369 per month, he stipulated to $33,333 in monthly income for the purpose of setting child support. She also alleged that Martin had stopped paying child support in January 2009. She asked the court to order child support of $6,463 per month based on Martin's previously stipulated income, minimum wage for her, and 30 percent visitation to Martin.

### A. *Martin's Testimony*

At the evidentiary hearing on his OSC, Martin testified he had been selling assets and borrowing money to pay child support and had no further sources of credit. He asked the court to "use the accurate numbers" to determine child support.

Martin stated that the 2006 agreement was a compromise and a combined settlement of the property and support issues to "take it out of the court system." According to Martin, $375,000 of the equalizing payment "was for the spousal support buyout" and the remaining $2 million was to settle the property issues. Although the parties disputed the value of the marital estate, $2.375 million for the equalizing payment was a compromise figure.[4]

---

[4] Martin testified he expected to obtain a loan on the House to fund the equalizing payment. However, he was not able to borrow against the House because the title "was corrupted." Martin blamed Alli for the title problems, describing that it took over a year for Alli to sign a document needed to clear up the problem. Alli testified that she signed the documents prepared by the title company, but they were rejected by the county and the title company declined to fix its mistake. She stated she never refused to sign anything to clear title, and Martin never gave her anything to sign. Martin stated he was forced to sell the Building to fund the equalizing payment because of the title problems with the House, resulting in a loss of over $100,000 in

Martin recalled that Alli had initially demanded $10,000 to $15,000 per month for child support and that $7,000 per month for child support was a "bartered number" that was not based on actual income. The parties first agreed to $7,000 per month, then ran a series of Xspouse calculations to determine the amount of income necessary to support that number, and came up with $33,333 per month ($400,000 per year). According to Martin, the 20 percent figure they used accurately reflected his visitation percentage in 2006 and visitation gradually increased over time.

Martin estimated that in 2006 his income from all sources was closer to $150,000 per year ($12,500 per month). He told the court that he had planned to retain the Building and had hoped that by working full time, plus the rental income, he would net $150,000 per year and could afford $7,000 per month for child support. On cross-examination, Martin testified that he declared income of $16,246 on his tax returns in 2006 and $26,000 in 2007; that he earned about $30,000 per year since 2007; and that his taxable income for 2009 was $26,000 to $27,000. He agreed that, theoretically, he could set his salary at any number he wanted, but if he paid himself an unreasonable number, the company would dissolve.

At the time of the hearing, Martin was working 20 hours per week, the same as in 2006. CPI had determined that the value of his services was $60,000 per year full time. Martin testified that if he could work full time, he could get CPI to be profitable, but he also stated the time he devotes to child care and the dissolution proceedings prevents him from working full time.

Periodically, Martin borrows money from CPI. He borrowed $100,000 in 2006 and $200,000 in 2007; by 2010, he had borrowed almost $400,000. Every loan is documented with a note secured by the House and recorded against the property. Martin did not pay principal or interest on any of the loans in 2006 or 2007. He made a substantial interest payment on December 8, 2008, three days after he filed his OSC to modify support. He borrowed the money for the interest payment from his parents.

Martin testified that he gives Alli his entire paycheck, except for $5, which he uses to pay utilities. His only source of income other than his paycheck is liquidating assets and borrowing. When the court asked Martin to estimate his net worth, he responded that it depended on how much equity he has in the House. He owes his parents, coworkers and friends about $1 million and a neighbor's home recently sold for $1.6, so he estimated the equity in the House at $500,000. He described the value of CPI as "negligible," since it is

annual rental income. In 2006, CPI paid Martin $7,200 per month to rent the Building. Martin sold the Building to his parents and Keikha. After the sale, CPI paid the new owners $15,000 per month to rent the Building.

not making a profit, and he estimated its "liquidation value" at $200,000. CPI has been losing a few hundred thousand dollars a year.

In 2006, Martin understood that if his financial situation improved, Alli could come back and ask for more child support. He recalled the commissioner telling him that a "substantial change" would be required to modify support.

### B. *Alli's Testimony*

Alli received the $2.375 million equalizing payment in January 2007 and she invested the entire amount. She earned $100,000 in dividend income in 2007, all of which she reinvested. She later used $1.4 million to buy a house. Of the remaining $900,000, she lost $600,000 due to a downturn in the stock market. She used some of the balance to pay her attorney fees and for support after Martin stopped paying. At the time of the hearing, she estimated that she had $220,000 left. In 2009, she earned $2,810 in dividend income, all of which was reinvested. Her monthly expenses at the time of the hearing were approximately $7,000. Martin paid $13,000 in child support in 2009.

Alli agreed that Martin's visitation timeshare had increased and that he had the children approximately 38 percent of the time.

Alli described her understanding of the 2006 agreement as setting a fixed amount for child support and that she could not ask for an increase "even with inflation." She did not think that Martin had the option to modify support, even with a "substantial change" in circumstances. She testified that during the marriage, Martin earned several hundred thousand dollars each year; they always had rental income and a lot of miscellaneous income.

### C. *Testimony of Alli's Vocational Expert*

Alli retained Peter Davie to evaluate Martin's earning capacity. Davie reviewed Martin's resume, deposition, tax returns, and company Web site and researched his patent applications. Martin's role within CPI includes product identification, business development, marketing, vendor and supplier selection, and overseeing manufacturing. Davie developed a list of nine jobs that match Martin's skill set (from senior product manager at the low end to vice-president of engineering at the high end) and conducted a compensation survey for those jobs. Davie determined Martin could earn between $134,090 and $215,944 annually working for another employer, with an average of $177,328, and that it would take him four to six months to find work. Davie concluded that the $30,000 Martin earns for part-time work was below his earning capacity.

D. *Testimony of Alli's Accounting Expert*

Alli hired certified public accountant Reagan Wade to analyze Martin's income and CPI's performance for 2006 through 2009. For CPI, Wade calculated gross revenue of $4,171,112 and net losses of $367,733 in 2006; gross revenue of $4,505,098 and $60,471 net losses in 2007; gross revenue of $4,024,177 and $44,969 net losses in 2008; and gross revenue of $3,177,594 and $232,169 net losses in 2009. The company reported losses every year between 2006 and 2009; but it had fewer losses in 2009 than in 2006 by about $135,000, and even fewer losses in 2007 and 2008. CPI's expenses included Martin's salary, which was $26,910 in 2006, 2007, and 2009 and $27,910 in 2008. Since Martin owns the company, he has the discretion to set his salary.

In addition to his reported salary, Martin received loans from CPI: $100,000 in 2006; $213,500 in 2007; and $74,000 in 2008, for a total of $387,500. Wade opined that these payments were money available for support and that Martin is taking money out of CPI in the form of loans rather than as additional salary. There was no evidence Martin ever repaid any of these loans and he did not pay interest, except for one interest payment in December 2008. Moreover, CPI does not treat the payments to Martin as loans from the standpoint of accruing interest revenue.

Keikha has been lending money to CPI on a fairly regular basis, which the company pays back within a short time. In January 2006, CPI owed Keikha $500,000 and paid it back by November 2006. The highest figure since then was $355,000; in December 2008, the balance was zero; in December 2009, CPI owed Keikha $50,000. Wade characterized these payments as short-term loans to cover cashflow deficiencies and stated that it was unusual that no interest was paid or accrued.

Wade reviewed Martin's personal bank records, which revealed total deposits of $272,358 in 2006; $258,937 in 2007; $204,254 in 2008; and $85,980 through October of 2009. These amounts were "significantly higher" than the salary and loans Martin received from CPI and none of it went back into CPI.

Wade analyzed CPI's assets, liabilities, and retained earnings. As of December 31, 2009, CPI had $2.4 million in assets, $91,000 in liabilities, and retained earnings of $2,347,650; it had $10,000 of capital stock for total equity of $2,357,650. Wade performed the same analysis for each year since 2006 and observed that CPI's liabilities had remained about the same for each year, except 2007. "Even though CPI has lost money each of the last four years, CPI has only had to borrow funds on a short term basis and has

been able to repay those loans in a timely fashion. Other than December 31, 2007, when CPI's liabilities were $216,128, CPI's liabilities have not been above $100,000 at the end of 2006, 2008, or 2009. CPI has been able to continue to fund losses and to provide money to [Martin] without increasing [its] debt." Wade testified that CPI's assets are significantly greater than its liabilities, which results in positive retained earnings. About half of CPI's assets are inventory, which can be sold to pay debts. According to Wade, CPI's retained earnings were $2.688 million in 2006, $2.626 million in 2007, $2.613 million in 2008, and approximately $2.348 million in 2009.

### E. *Testimony of Jess Zuleta*

Jess Zuleta is CPI's controller. He testified that CPI is a "one-man corporation" and that Martin can do whatever he wants with CPI. Martin decides which products to manufacture and sell, enters into contracts with vendors, and decides when the company borrows and lends money. Keikha is in charge of sales, purchasing, and inventory. Keikha is at the office every day; Martin is out of the office most of the time.

CPI does not have a policy about lending, but since Martin is the company president, loans to Martin are authorized. Martin asked Zuleta to draw up checks as loans 15 to 20 times between 2006 and 2008. Martin has not borrowed from CPI since December 2008. At that time, Martin owed CPI $387,500. Zuleta has never asked Martin to repay the loans, but Martin gave CPI a promissory note in 2008, which is due in 2011.

### III. *Trial Court Ruling*

During the hearing, the court inquired whether the modification of child support required a "material" or a "substantial" change in circumstances and the parties discussed the applicable standard. Before ruling on the motion to modify support, the court reviewed the transcript of the 2006 proceedings before the commissioner and stated it was satisfied that the parties had agreed there would be "no deviation downward" from $7,000 per month for child support "except on substantial change of circumstances." The court found a substantial change in Martin's visitation timeshare from 20 percent to 38.5 percent, but found no substantial change in Martin's income from CPI. The court encouraged Martin to "devote more time to the company" and to "redirect [his] energy away from the case and towards [his] business pursuits."

The court reduced child support to $6,178, based on the same monthly income of $33,333 for Martin and the increase in his visitation timeshare. The court ordered Martin to pay arrearages of $79,325.82 by October 1, 2010, after which date any unpaid balance would be paid at $1,000 per month with interest at the legal rate of 10 percent. Martin appeals.

## DISCUSSION

### I. Standard of Review

"The standard of review for an order modifying a child support order is well established. '[A] determination regarding a request for modification of a child support order will be affirmed unless the trial court abused its discretion, and it will be reversed only if prejudicial error is found from examining the record below.' [Citations.] Thus, '[t]he ultimate determination of whether the individual facts of the case warrant modification of support is within the discretion of the trial court. [Citation.] The reviewing court will resolve any conflicts in the evidence in favor of the trial court's determination.' " (*In re Marriage of Williams* (2007) 150 Cal.App.4th 1221, 1233–1234 [58 Cal.Rptr.3d 877] (*Williams*), quoting *In re Marriage of Leonard* (2004) 119 Cal.App.4th 546, 555, 556 [14 Cal.Rptr.3d 482].)

But, as this court observed in *In re Marriage of Cheriton* (2001) 92 Cal.App.4th 269, 282–283 [111 Cal.Rptr.2d 755] (*Cheriton*), "the trial court has 'a duty to exercise an informed and considered discretion with respect to the [parent's child] support obligation . . . .' [Citation.] Furthermore, 'in reviewing child support orders we must also recognize that determination of a child support obligation is a highly regulated area of the law, and the only discretion a trial court possesses is the discretion provided by statute or rule. [Citations.]' [Citation.] In short, the trial court's discretion is not so broad that it 'may ignore or contravene the purposes of the law regarding . . . child support.' "

In conducting our review for an abuse of discretion, we determine "whether the court's factual determinations are supported by substantial evidence and whether the court acted reasonably in exercising its discretion." (*In re Marriage of de Guigne* (2002) 97 Cal.App.4th 1353, 1360 [119 Cal.Rptr.2d 430] (*de Guigne*).) We do not substitute our own judgment for that of the trial court, but determine only if any judge reasonably could have made such an order. (*Ibid.*)

Martin's contentions also require us to determine whether the court applied the correct legal standard, specifically whether Martin's requested modification required a "material" change in circumstances or a "substantial" change in circumstances, and whether there is any difference between the two. As this issue presents a question of law, our review of the applicable standard is de novo. (*In re Marriage of David & Martha M.* (2006) 140 Cal.App.4th 96, 100–101 [44 Cal.Rptr.3d 388].)

## II. *The Court Did Not Apply the Wrong Legal Standard*

The trial court concluded that it was bound by the parties' agreement, such that proof of a substantial change in circumstances would be required in order to modify support. Martin contends that modification of an "above guideline" support order requires proof of a "material" change in circumstances, not a "substantial" change, and that the court applied the wrong legal standard. He argues that if the court had applied the correct standard, it may have concluded that the changes in his financial situation were "sufficient to constitute a change of circumstances" that merited further reduction of his child support obligation.

### A. *General Principles Regarding Child Support*

■ "California has a strong public policy in favor of adequate child support. [Citations.] That policy is expressed in statutes embodying the statewide uniform child support guideline. (See Fam. Code, §§ 4050–4076.)" (*Cheriton, supra,* 92 Cal.App.4th at p. 283.) "The guideline seeks to place the interests of children as the state's top priority." (Fam. Code,[5] § 4053, subd. (e).) In setting guideline support, courts are required to adhere to the principles set forth in section 4053, which include: (1) "A parent's first and principal obligation is to support his or her minor children according to the parent's circumstances and station in life"; (2) "[b]oth parents are mutually responsible for the support of their children"; (3) "[e]ach parent should pay for the support of the children according to his or her ability"; (4) "[c]hild support orders in cases in which both parents have high levels of responsibility for the children should reflect the increased costs of raising the children in two homes and should minimize significant disparities in the children's living standards in the two homes"; and (5) "[c]hildren should share in the standard of living of both parents. Child support may therefore appropriately improve the standard of living of the custodial household to improve the lives of the children." (§ 4053, subds. (a), (b), (d), (g), (f).)

■ To implement these policies, courts are required to calculate child support in accordance with the mathematical formula in section 4055. (*Cheriton, supra,* 92 Cal.App.4th at p. 284.) "Determining child support under the guidelines has been criticized as a 'complex and unduly costly' process 'which requires the use of a computer and which is not understood by anyone, least of all the affected parties.' " (*Ibid.*) Nevertheless, adherence to the guideline is mandatory and the guideline amount of child support is presumptively correct. (See §§ 4055, 4057, subd. (a); *de Guigne, supra,* 97 Cal.App.4th at p. 1359.) The trial court may not depart from the guideline

---

[5] All further statutory references are to the Family Code.

except in the special circumstances enumerated in section 4057, which include the obligor parent's "extraordinarily high income" and cases where the "parties have stipulated to a different amount of child support under subdivision (a) of Section 4065." (§ 4057, subd. (b)(3), (1).)

### B. Agreements Regarding Child Support; Modification of Child Support

The Family Code allows parents to make agreements pertaining to child support, but such agreements are always "subject to [the] approval of the court." (§ 4065, subd. (a).) Section 3651 governs the modification or termination of support orders, "whether or not the support order is based upon an agreement between the parties." (§ 3651, subd. (e); see *In re Marriage of Alter* (2009) 171 Cal.App.4th 718, 726 [89 Cal.Rptr.3d 849] (*Alter*).) Under the express terms of section 3651, "all support orders, even those based upon the agreement of the parties, are modifiable prospectively, except spousal support orders that the parties have agreed may not be modified." (*Alter*, at p. 727, italics omitted.) The provisions of an agreement for child support are "separate and severable from all other provisions of the agreement relating to property and [spousal support]. An order for child support based on the agreement shall be law-imposed and shall be made under the power of the court to order child support." (§ 3585.)

As the Supreme Court explained over 30 years ago: "When a child support agreement is incorporated in a child support order, the obligation created is deemed court-imposed rather than contractual, and the order is subsequently modifiable despite the agreement's language to the contrary." (*Armstrong v. Armstrong* (1976) 15 Cal.3d 942, 947 [126 Cal.Rptr. 805, 544 P.2d 941].) More recently, this court explained: "It is true that parties may settle their disputes over child support by agreement. This state has a 'strong policy favoring settlement of litigation' over family law disputes. [Citation.] . . . But such agreements, to the extent that they purport to restrict the court's jurisdiction over child support, are void as against public policy. [Citations.] Children have the 'right to have the court hear and determine all matters [that] concern their welfare and they cannot be deprived of this right by any agreement of their parents.' [Citation.] Thus, these agreements are not binding on the children or the court, and the court retains jurisdiction to set child support irrespective of the parents' agreement." (*In re Marriage of Bereznak* (2003) 110 Cal.App.4th 1062, 1068–1069 [2 Cal.Rptr.3d 351].) Thus, the original child support order here was severable from the parties' 2006 agreement and "imposed not by contract but by the power of the court." (*Alter, supra*, 171 Cal.App.4th at p. 728.)

In *Alter*, the parties entered into a marital settlement agreement that provided for the father to pay child support of $4,000 per month plus tuition

and certain other expenses. The agreement also provided that the child support obligation would be " 'absolutely non-modifiable downward.' " (*Alter, supra*, 171 Cal.App.4th at p. 723.) Three years later, the father commenced proceedings to reduce support based on changed circumstances, arguing that the income he anticipated receiving from a commercial building when he signed the marital settlement agreement had never materialized. (*Ibid.*) The trial court granted the father's request and modified support to $2,850, $2,839, and $3,045 per month for the years 2005, 2006, and 2007. (*Id.* at p. 726.) On appeal, the mother argued that the court did not have the power to reduce child support because the court was "legally bound" by the parties' contractual agreement that support could not be modified downward.

In deciding *Alter*, this court observed that "no California case of which we are aware has addressed the precise question of whether the court must honor an agreement setting an absolute minimum for child support." (*Alter, supra*, 171 Cal.App.4th at p. 729.) After reviewing the legal principals set forth above, we concluded that "the statutory scheme and associated case law make no distinction between a court's jurisdiction to increase an order for child support and its jurisdiction to decrease it. *Section 3651* makes all such orders 'modifiable,' which could mean a change in either direction. Furthermore, *section 4053* instructs that in calculating child support, the court should adhere to the principles, among others, that '[b]oth parents are mutually responsible for the support of their children' [citation] and that '[e]ach parent should pay for the support of the children according to his or her ability' [citation]. Under [the mother's] view, if the parties had previously agreed to prohibit any downward modification of the child support payment, then, even if circumstances change, the court would have to ignore those legislatively mandated principles and require the parent to pay an amount he or she cannot afford and that does not represent that parent's fair share of support." (*Id.* at p. 729.) The mother had argued "that agreements setting a floor for child support should be enforceable for public policy reasons, implicitly suggesting that more is always better than less for the child." (*Id.* at p. 730.) We stated that "[w]hile at first glance it might seem that respecting such an agreement would inevitably be in the best interests of the child, that might not always be so. Parents' circumstances are subject to adversities out of their control. A serious accident, catastrophic illness, or a flagging economy and the hard times that go along with it, can all interpose a reversal of fortune that would make it impossible for the parent to satisfy a preset level of child support. In such a situation, it would not be in the child's best interest to force the parent into a level of debt he or she has no ability to pay. Certainly there is no public policy that would require it." (*Ibid.*) We concluded that "the court always has the power to modify a child support order, upward or downward, regardless of the parents' agreement to the contrary." (*Ibid.*)

■ In *In re Marriage of Laudeman*, the parties agreed that the father would pay child support that was approximately $515 over the guideline amount. About a year later, the father (who had remarried) applied for an order reducing support to the guideline amount. (*In re Marriage of Laudeman* (2001) 92 Cal.App.4th 1009, 1011–1012 [112 Cal.Rptr.2d 378] (*Laudeman*).) The trial court modified support as requested and the mother appealed. (*Id.* at p. 1012.) The appellate court observed that section 4065 provides: " 'If the parties to a stipulated agreement stipulate to a child support order *below* the amount established by the statewide uniform guideline, no change of circumstances need be demonstrated to obtain a modification of the child support order to the applicable guideline level or above.' " (*Laudeman, supra*, 92 Cal.App.4th at p. 1015, quoting § 4065, subd. (d).) The court concluded that "[s]ince there is no concomitant provision for stipulated child support orders *above* the amount established by the statewide uniform guideline, the ineluctable inference is that a 'change of circumstances' must be demonstrated to obtain a downward modification of the child support order to the applicable guideline level or below. In short, the statute lets either party ' "renege" on the stipulation at any time, and without "grounds," ' if the stipulated award is below the guideline amount [citation], but otherwise adheres to pre-guideline law and requires proof of changed circumstances to reduce a higher award." (*Ibid.*, some italics omitted, citing *In re Marriage of Norvall* (1987) 192 Cal.App.3d 1047, 1051 [237 Cal.Rptr. 770] ["Generally, a change of circumstances must be shown before a [child] support order can be modified."] & *In re Marriage of Catalano* (1988) 204 Cal.App.3d 543, 548–549 [251 Cal.Rptr. 370] ["To justify a modification of child support, it is usually necessary to show that there has been a material change of circumstances . . . ."].) "Each case stands or falls on its own facts, but the overriding issue is whether a change has affected either party's financial status." (*Laudeman, supra*, 92 Cal.App.4th at p. 1015.) The father in *Laudeman* had requested a reduction in child support to the guideline amount without a showing of changed circumstances. The court stated, "Implicit in this argument is the notion that his earlier generosity entitles him to withdraw from his agreement. He is mistaken." (*Id.* at pp. 1015–1016.) The court held that since the father's modification request was not based on changed circumstances, the trial court's order could not stand and reversed the order modifying child support. (*Id.* at p. 1016.)

In *Williams*, this court examined section 4065 and concluded that when the parties have stipulated to a child support order that is *at or above* the guideline amount, "a showing of changed circumstances [is] a necessary predicate to an upward modification of the child support order." (*Williams, supra*, 150 Cal.App.4th at p. 1235.) The trial court in *Williams* had ordered an increase in child support after finding that "material changed circumstances" existed regarding both parties' financial conditions. (*Ibid.*) On appeal, we

concluded that the court did not abuse its discretion in making that finding, since "the changes in the parties' respective financial conditions were essentially undisputed." (*Id.* at p. 1236.)

### C. *"Substantial" Versus "Material" Change*

Martin acknowledges that a change of circumstances is required to modify support, but asserts that the court applied the wrong standard in determining whether to modify support in this case. He contends the court erred in applying the "substantial" change of circumstances standard that the parties agreed upon, while case law requires only a showing of a "material" change. To place his contention in context, we review the discussion of this issue at the hearings on Martin's request to modify support.

During closing arguments and in her trial brief, Alli argued there was no "material change" in circumstances to warrant an adjustment of child support. Martin also used the "material change" standard. The court said the minute order from October 2006 indicated that the parties needed to show a "substantial change" to modify support and asked whether the standard was a "material change" or a "substantial change" in circumstances.

Alli's counsel responded, "I'm not sure there's a difference from a legal standpoint between material and substantial" and the court said, "Substantial sounds like more than material." Alli's counsel argued that the "specific terms of the order in this case would probably trump the general standard." The court then inquired whether the "substantial change" language was in the agreement "or just a comment that the commissioner made." (Our review of the agreement reveals that it does not address the standard required for modification of child support.) Later, the court observed, "I think the law only requires material change, not substantial change, although those terms have been confusingly interchanged in case law over time."

When the parties returned a week later to complete their arguments, the judge advised them that he had obtained a "rough transcript" of the proceedings before the commissioner on October 13, 2006.[6] The transcript revealed that after reciting the terms on the record, the commissioner stated, "The Court will approve that. And there would have to be a substantial change in circumstances to warrant a modification. A substantial change in circumstances clearly would be disability of the father . . . . Other substantial changes in circumstances I'm going to leave up to who else handles this case

---

[6] The record does not contain a transcript of the October 13, 2006 proceedings. However, the court read portions of the "rough transcript" into the record during the proceedings in March 2010, and we rely on that record.

for you folks in the future." The commissioner asked the parties if his understanding of the agreement was correct and both Alli's counsel and Martin said, "yes."

With this background in mind, we return to the question whether the court applied the wrong legal standard when it held that Martin had not shown a "substantial change" in income to warrant a modification on that basis. This inquiry necessarily requires that we examine what the correct standard is for modification of a child support order.

█ In *Cheriton*, we stated that the statutory procedures for modification of child support "require a party to introduce admissible evidence of *changed circumstances* as a necessary predicate for modification." (*Cheriton, supra*, 92 Cal.App.4th at p. 298, italics added, citing §§ 3650–3693, *In re Marriage of Popenhager* (1979) 99 Cal.App.3d 514, 521 [160 Cal.Rptr. 379] (*Popenhager*) & *In re Marriage of Mulhern* (1973) 29 Cal.App.3d 988, 992 [106 Cal.Rptr. 78] (*Mulhern*).) We did not use either "material" or "substantial" to define the type of change required to modify support.

Sections 3650 through 3693, cited in *Cheriton*, do not mention "changed circumstances." But, as noted previously, section 4065, subdivision (d) provides: "(d) If the parties to a stipulated agreement stipulate to a child support order below the amount established by the statewide uniform guideline, *no change of circumstances* need be demonstrated to obtain a modification of the child support order to the applicable guideline level or above." (Italics added.) And section 4069 provides: "The establishment of the statewide uniform guideline constitutes *a change of circumstances*." (Italics added.) Thus, the statutes use "change of circumstances" language without specifying what type of change is required.

Our review of case law reveals the use of all three phrases: "change in circumstances," "material change in circumstances," and "substantial change in circumstances." Child support cases that use the phrase "change in circumstances" without further description include *In re Marriage of Norvall* (1987) 192 Cal.App.3d 1047, 1051 [237 Cal.Rptr. 770]; *Popenhager, supra*, (1979) 99 Cal.App.3d 514, 521; and *Petersen v. Petersen* (1972) 24 Cal.App.3d 201, 203, 207 [100 Cal.Rptr. 822]. This court also applied a "change in circumstances" standard in *Williams, supra*, 150 Cal.App.4th at page 1235, although the trial court's order in that case was phrased in terms of a "material change."

Child support cases that use the "material change in circumstances" language include *In re Marriage of Gruen* (2011) 191 Cal.App.4th 627, 638 [120 Cal.Rptr.3d 184] (*Gruen*); *In re Marriage of Stanton* (2010) 190

Cal.App.4th 547, 553 [118 Cal.Rptr.3d 249] (*Stanton*); *In re Marriage of Mosley* (2008) 165 Cal.App.4th 1375, 1385 [82 Cal.Rptr.3d 497] (which also uses the phrase "changed circumstances"); *Laudeman, supra,* 92 Cal.App.4th at pages 1011–1012; *Philbin v. Philbin* (1971) 19 Cal.App.3d 115, 119 [96 Cal.Rptr. 408] (child and spousal support); and *In re Marriage of Catalano, supra,* 204 Cal.App.3d at page 548. Recent cases that use the "material change in circumstances" language cite the family law treatise Hogoboom & King, California Practice Guide: Family Law (The Rutter Group 2010) section 17:25, page 17-10 (rev. # 1, 2010), in which the authors state: "As a general rule, courts will not revise a child support order unless there has been a 'material change of circumstances.' " (See, e.g., *Gruen, supra,* 191 Cal.App.4th at p. 638; *Stanton, supra,* 190 Cal.App.4th 547, 553.)

The court in *Mulhern, supra,* 29 Cal.App.3d 988, 991–992 used the term "substantial" to describe the change in circumstances required to modify spousal support. In *Mulhern,* the court stated that former Civil Code section 4801, which governed modifications of spousal support orders, "is subject to the rule that a trial court is without authority to modify an award for spousal support in the absence of a *substantial* change of circumstances occurring subsequent to the entry of the decree." (*Ibid.,* italics added.) But none of the cases that *Mulhern* cited for this rule used the word "substantial"; they used the phrase "material change" (*Philbin v. Philbin, supra* 19 Cal.App.3d 115, 119 [child and spousal support]; *Hester v. Hester* (1969) 2 Cal.App.3d 1091, 1095 [82 Cal.Rptr. 811] [spousal support]) or simply required a "change of circumstances" (*Rich v. Rich* (1956) 143 Cal.App.2d 794, 797 [300 P.2d 60] [spousal support]). *In re Marriage of Farrell* (1985) 171 Cal.App.3d 695, 700 [217 Cal.Rptr. 397], another spousal support case, uses the phrases "material change" and "substantial change" interchangeably.[7] These cases lead to the question: is there a difference between a "material" change and a "substantial" change?

Webster's Third New International Dictionary Unabridged (1993) at page 1392 defines "material" as "being of real importance or great consequence : substantial" and "essential." (Capitalization omitted.) The same dictionary defines "substantial" as "being of moment : important, essential" and "something of moment : an important or material matter, thing, or part." (*Id.* at p. 2280, capitalization omitted.) The two words are highly similar in meaning. This conclusion is borne out by the entries in Roget's II, The New Thesaurus (3d ed. 1995) pages 622 and 975, which treats the words as synonyms. It defines "material" in sense 4 as "having great significance: big,

---

[7] We note also that Judicial Council form FL-192 (Information Sheet on Changing a Child Support Order) instructs that an "existing order for child support may be modified when the net income of one of the parents changes *significantly*, the parenting schedule changes *significantly*, or a new child is born." (Italics added.)

consequential, considerable, historic, important, large meaningful, monumental, significant, *substantial*" and "substantial" in sense 5 as "[h]aving great significance: big, consequential, considerable, historic, important, large, *material*, meaningful, monumental, significant." (*Ibid.*) Black's Law Dictionary (8th ed. 2004) page 998 defines "material" as "[o]f such a nature that knowledge of the item would affect a person's decision-making; significant; essential." Black's Law Dictionary does not define the word "substantial," but does contain an entry for the phrase "substantial change in circumstances," which refers the reader to the entry for "change in circumstances." (*Id.* at p. 1469.) The entry for "change in circumstances" defines it as: "*Family law*. A modification in the physical, emotional, or financial condition of one or both parents, used to show the need to modify a custody or support order; esp. an involuntary occurrence that, if it had been known at the time of the divorce decree, would have resulted in the court's issuing a different decree, as when an involuntary job loss creates a need to modify the decree to provide for reduced child support payments.—Also termed *change of circumstances* . . . ; *material change in circumstances*; *substantial change in circumstances*; *change of condition*." (*Id.* at p. 247.)

■ In view of this primary and secondary authority, we conclude that a "material" change in circumstances is the same as a "substantial" change in circumstances for the purpose of modifying child support. Consequently, the court did not apply the wrong legal standard and did not abuse its discretion when it used a "substantial" change in circumstances standard rather than a "material" change standard to determine whether a change in Martin's income merited reduction of his child support obligation.

We reach this conclusion notwithstanding the trial court's statement that "material" is different from "substantial." The court made this remark during the first day of the proceedings, before it reviewed the transcript of the settlement conference, and did not make a finding on the issue in the order modifying support. "Because we review the correctness of the order, and not the court's reasons, we will not consider the court's oral comments or use them to undermine the order ultimately entered." (*Whyte v. Schlage Lock Co.* (2002) 101 Cal.App.4th 1443, 1451 [125 Cal.Rptr.2d 277].) Thus, the court's comments do not undermine our conclusion that the court applied the correct standard and therefore did not abuse its discretion.

III. *The Court Did Not Abuse Its Discretion When It Found No Change in Income*

Martin contends the court abused its discretion when it found no substantial change in the primary source of his income since the 2007 judgment. He asserts the following changed circumstances: (1) he sold assets to pay

support; (2) he liquidated all his "stocks, bonds and cash" to pay support; (3) he is no longer borrowing from CPI; (4) to fund the equalizing payment, he sold the Building that had previously generated $100,000 in annual income; (5) his company workforce has been reduced by approximately one half; (6) he borrowed against the House; and (7) his bank statements showed significantly less cashflow. He also notes that his visitation increased, which we address separately.

Martin presented no evidence of job loss or job change. He continued to work as president and primary owner of CPI, and as such his income was within his discretion and control. His salary had not changed between 2006 and 2009, except for a minor increase of $1,000 in 2008. He did not present any evidence of a change in his standard of living. He continued to live in the House.

Regarding his claim that he had to sell assets to pay support, Martin testified that when the parties entered into their agreement, he knew he "would have to sell [his] IRA" and he "would have to borrow and sell property to make the support payment."

Similarly, regarding selling the Building and borrowing against the House, the agreement specifically contemplated that Martin might have to sell the Building or borrow to fund the equalizing payment. It expressly stated that "[b]orrowing to pay the equalization payment does not constitute a change of circumstances for the calculation of child support, nor does payment of any debt or interest on such debt. It is contemplated that [Martin] will need to borrow to pay the equalizing payment stated in this agreement." It further provided that if Alli did not receive the equalizing payment by January 15, 2007, the Building would be "listed for sale forthwith and the first $2,375,000 of net proceeds" used to pay the equalizing payment.

Although Martin had stopped borrowing money from CPI in December 2008, in our view, that does not constitute a change in circumstances that merits adjusting his support. Martin filed his OSC to modify support that same month and stopped paying child support the following month, so Martin's change in borrowing was a condition under his control. Moreover, Alli's accounting expert testified the loans Martin obtained from CPI were a form of income available for support.

Regarding his claim that the company employs half the people it did in the past, Martin does not specify a particular timeframe. The record suggests the company was very profitable in the late 1990's, but does not indicate how many people it employed in 2006. Martin testified that the company employed 16 people and "some consultants" in 2010 and that it had two to three

times that "at the peak." However, he did not say when the company was at its peak. Zuleta testified that the company employed 21 people in 2010.

Martin told the court CPI was not profitable when the parties entered into the agreement in 2006 and has remained the same, "flat, going down a bit." He told the court that commercial work was down by 20 to 25 percent, but government work was up by an unspecified factor. Martin also told the court that if he worked full time, the company could be profitable.

Alli's accounting expert testified regarding CPI's financial status. Gross revenue was about the same in 2006 and 2008 (when Martin filed his OSC) and losses had decreased. However, in 2009, gross revenue was about $1 million less than it had been the previous three years, although overall losses were still lower than in 2006. Keikha was lending money to CPI before the parties' agreement, and continued to make short-term loans that the company paid off on a regular basis since October 2006. At the end of 2009 CPI only owed Keikha $50,000. During the four-year period at issue, CPI has been able to continue to fund losses and to provide money to Martin without increasing its debt. Other than 2007, when CPI's liabilities were $216,128, its liabilities were not more than $100,000 at the end of 2006, 2008, or 2009. CPI's assets were significantly greater than its liabilities, with positive retained earnings of $2.688 million in 2006, $2.626 million in 2007, $2.613 million in 2008, and approximately $2.348 million in 2009. Although there was some decrease in retained earnings in 2009, CPI's overall financial condition in 2009 was very similar to its condition in 2006.

■ Thus, we find sufficient evidence to support the court's conclusion that Martin's income had not changed. Any judge could have reasonably concluded that that there was no change in circumstances regarding Martin's income between October 2006 and March 2010 and, therefore, reversal for an abuse of discretion is not required.

### IV. *The Court Correctly Addressed the Change in Timeshare*

In his opening brief, Martin argues that the court "found a substantial change of circumstances with respect to timeshare, but incorrectly determined that not to be a substantial change of financial circumstances" and that the court erred by ignoring the change in visitation. But the court did not ignore that change.

■ The guideline formula relies on a number of factors, including each parent's visitation timeshare and income. (§§ 4053, subd. (c), 4055.) The trial court determined there was a substantial change in timeshare, but no substantial change in income. Based on its finding that Martin's timeshare had increased

from 20 percent to 38.5 percent, the court reduced child support by $822 per month (from $7,000 to $6,178) to account for that change. Since the court reduced child support based on Martin's increased timeshare, there is no merit to this contention.

**DISPOSITION**

The April 7, 2010 order modifying child support is affirmed.

Rushing, P. J., and Duffy, J., concurred.