Filed 4/4/25

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re Marriage of ROD ALAN and HUB ALAN FREEMAN. | |
| ROD ALAN FREEMAN, Respondent, v. HUB ALAN FREEMAN, Appellant. | G064552 (Super. Ct. No. FLIN2001192) O P I N I O N |

Appeal from an order of the Superior Court of Riverside County, Johnnetta E. Anderson, Judge. Affirmed.

Sheila A. Williams and Laura J. Fuller for Appellant.

Holstrom, Block & Parke and Ronald B. Funk for Respondent.

\*         \*         \*

Appellant Hub Alan Freeman and respondent Rod Alan Freeman were domestic partners and then spouses for over 15 years before separating.[1] After their marital dissolution trial, the family court ordered Hub to pay Rod $2,100 a month in permanent spousal support. It also found the community had a 60.2 percent interest in a rental property that Hub had purchased prior to their domestic partnership. The parties submitted expert opinions as to the rental property's value. The court found Rod's expert to be more persuasive and used his opinion to determine the rental property's value.

On appeal, Hub primarily challenges the amount of the spousal support award. He also asserts the family court denied him due process by failing to give his counsel adequate time to question witnesses on the final day of trial. We are unpersuaded by either argument.

Hub's remaining contention appears to arise from a misunderstanding of the *Moore/Marsden* rule.[2] Under this rule, "the community acquires a *pro tanto* interest" in a party's separate property "[w]hen community property is used to reduce the principal balance of a mortgage on" the property. (*Bono v. Clark* (2002) 103 Cal.App.4th 1409, 1421–1422.) Once the community's pro tanto percentage interest is calculated, it is multiplied by the total value of the property to determine the dollar value of the community's interest. We publish this case to clarify that the community's pro tanto percentage interest is calculated as of the time of

---

[1] We refer to the parties by their first names since they share a surname.

[2] This rule is named after the cases from which it was derived: *In re Marriage of Moore* (1980) 28 Cal.3d 366, and *In re Marriage of Marsden* (1982) 130 Cal.App.3d 426.

the parties' separation, while the value of the property is generally determined as near as practicable to the time of trial.

For the above reasons, we affirm the court's order.

FACTS AND PROCEDURAL HISTORY

Rod and Hub registered as domestic partners in December 2004, married in June 2008, and then separated in April 2020. Rod filed a petition for dissolution of their domestic partnership and marriage in May 2020.

The parties had ownerships interests in two properties at the time of separation. The first was their residence in Indio, which listed both Hub and Rod on title. The second was a rental property on Micheltorena Street in Los Angeles (the Micheltorena property). Title to the Micheltorena property was solely in Hub's name. He had purchased it in 1992 prior to the parties' union, but it was not paid off until 2013. Following their separation, the parties agreed the community had an interest in the Micheltorena property, but they disputed the amount of that interest and the property's value.

At the time of their separation, both Hub and Rod had been unemployed for about seven years. Hub had supported the parties for the last five years of their relationship using income from the Micheltorena property, Social Security, and annuities and dividends. The parties stipulated that Hub's gross monthly income available for support was $11,391, and the monthly marital standard of living was $12,381.

The family court entered a status-only judgment in January 2023, dissolving the parties' marriage and domestic partnership but reserving jurisdiction over all other issues. The matter proceeded to trial, where two of the primary disputes involved the amount of spousal support

3

Hub would pay Rod and the value of the community's interest in the Micheltorena property.

As to spousal support, the family court applied the relevant support factors under Family Code section 4320.[3] Among other things, it found Hub's earning capacity was sufficient to maintain the marital standard of living, but Rod did not earn enough to meet this standard. The court explained that "ROD will suffer harmful consequences if support is denied. ROD has the need for spousal support and has been living off of temporary spousal support and a $1,000 a month dividend."

The family court also made findings as to Rod's job prospects. Though he had marketable skills, his "employment was impaired by HUB's request for ROD to take leave under FMLA [(Family and Medical Leave Act)] to care for HUB from April to September of 2015 . . . . HUB further requested that ROD remain unemployed and travel with the income built over their 23-year relationship. As of the time of trial, ROD [had been] unemployed for some seven years." The court concluded Rod had the ability to earn a salary of at least $5,400 per month. But it also noted Rod was 60 years old (Hub was 67) and had testified to having health issues that impaired his ability to obtain a job.

After reviewing all the section 4320 factors, the family court ordered Hub to pay Rod $2,100 in monthly spousal support. The court attached an Xspouse report showing "the net spendable income available to both parties upon imputation of wages and salary to ROD and the spousal

_____

[3] All further undesignated references are to the Family Code.

4

support order of $2,100.00 a month."[4] The court further noted that "[w]hile 4% more of the combined spendable income is assigned to ROD, HUB's temporary support order required him to pay more than this permanent order, and HUB was still able to maintain the marital standard of living."

As to the Micheltorena property, Rod and Hub both introduced expert testimony as to its value. Rod's appraiser, Alan Fradkin, valued the Micheltorena property at $2.1 million as of February 2022. Hub provided testimony from two expert witnesses. His first appraiser, Ho Joo Lee, valued the Micheltorena property at $1.44 million as of January 2021. His second appraiser, Scott Gardner, valued the property at $1,620,000 as of March 2022. The court found Fradkin's appraisal to be more accurate than Lee and Gardner's, and it valued the Micheltorena property at $2.1 million.

The family court also calculated the community's interest in the Micheltorena property under the *Moore/Marsden* rule. The court concluded "that all payments made during the legal union of the parties, were deemed to be made with community property." It adopted the findings of Rod's expert, who calculated a 60.2 percent community interest in the Micheltorena property based on the amount of principal paid and improvements made during the parties' relationship.

Following trial, the family court issued a statement of decision (the statement of decision) with the above findings. Hub objected to the statement of decision, but the court issued an order (the property division

---

[4] Xspouse is a computer program "used to calculate guideline child support under the formula required by Family Code section 4055." (*In re Marriage of Bodo* (2011) 198 Cal.App.4th 373, 378, fn. 3.)

5

order) overruling his objections and declaring the statement of decision as the court's final decision on these issues.

Hub appeals the property division order on three grounds: (1) the family court abused its discretion in calculating the spousal support order; (2) the court improperly calculated the Micheltorena property's value; and (3) the court violated Hub's procedural due process rights by giving his counsel insufficient time to examine the remaining witnesses on the final day of trial.

DISCUSSION

I.

SPOUSAL SUPPORT

A spousal support order is reviewed for an abuse of discretion. (*In re Marriage of Ackerman* (2006) 146 Cal.App.4th 191, 197.) This standard of review requires us to determine whether the family court's ruling "'exceeded the bounds of reason.'" (*Ibid*.) We must "'uphold a ruling which a reasonable judge might have made, even though we would not have ruled the same and a contrary ruling would also be sustainable. We cannot substitute our own judgment.'" (*Harman v. City and County of San Francisco* (2007) 158 Cal.App.4th 407, 428.)

Hub contends the family court made three errors in calculating spousal support. First, the amount of spousal support awarded was disproportionate to the parties' marital standard of living. Second, the court improperly relied on Xspouse to calculate spousal support. Third, the court wrongly based its permanent spousal support order on the temporary spousal support order. We find no error.

A. *Spousal Support Amount*

Hub's argument is based on the parties' stipulation that the marital standard of living was $12,381 a month. He claims, "[e]ach party is

6

entitled to one-half [of this amount] or $6,190.50 per month . . . as permanent spousal support." Monthly spousal support of $2,100, he claims, will give Rod $9,300 in total monthly income, which is 150 percent more than $6,190.50. Hub arrives at this $9,300 figure by adding together (1) $5,400, which is the amount the family court found Rod was able to earn; (2) $1,000, which is Rod's monthly income from dividends; (3) $800, which is Rod's purported community share of Hub's military pension; and (4) $2,100, which is the amount of spousal support.[5] Hub argues that spousal support should be reduced, or eliminated, so that Rod's total monthly income will be closer to half the marital standard of living (i.e., $6,190.50). We disagree.

To begin, Hub cites no authority for his assertion that Rod is only entitled to half the marital standard of living. Nor does it appear any such authority exists. Rather, family courts have broad discretion in fashioning spousal support orders to address the specific needs of the parties. (*In re Marriage of McLain* (2017) 7 Cal.App.5th 262, 269.) The marital standard of living is only a general reference point. (*In re Marriage of Khera & Sameer* (2012) 206 Cal.App.4th 1467, 1483–1484.) "'The Legislature has never specified that spousal support must always meet the needs of the supported spouse as measured by the marital standard of living.' . . . '[T]he trial court

---

[5] Hub's calculation appears to be inflated. He claims Rod will receive $800 in monthly income due to the community's interest in Hub's pension. But Hub provides no citation for this assertion. Rather, the statement of decision indicates the family court had not determined the community's interest in this pension at the time it awarded spousal support. Specifically, it states that the parties had stipulated that the community's interest in "all retirement accounts" would be divided by a qualified domestic relations order (QDRO). The court ordered the parties to meet and confer as to the accounts subject to the QDRO, and it appointed a third party to prepare the QDRO.

may fix spousal support at an amount greater than, equal to or less than what the supported spouse may require to maintain the marital standard of living, in order to achieve a just and reasonable result under the facts and circumstances of the case.'" (*Ibid*.)

Further, nothing in the record shows it was unreasonable for the family court to award Rod $2,100 in spousal support even if that gave him $9,300 in total monthly income. While the court found Rod could make $5,400 a month, it is unclear how many years he will be able to work (assuming he finds a job). He was 60 at the time of trial and there was evidence he had health issues impairing his ability to obtain employment. The court also found Hub "impaired" Rod's employment by asking him to take FMLA leave for several months, then asking him to remain unemployed so they could travel together. Due to Hub's requests, Rod had been unemployed for seven years by the time of trial. We can reasonably infer Rod would have had a higher potential income than $5,400 had he not chosen to remain unemployed for Hub.

In sum, the family court could have determined $2,100 in spousal support was reasonable based on Rod's age, job prospects, and the fact that Hub was partly responsible for Rod's unemployment. As such, we find no abuse of discretion.

B. *Xspouse Software and the Temporary Spousal Support Order*

Hub's second and third arguments are related. He contends the family court erred by "solely" relying on Xspouse to calculate permanent spousal support. Likewise, he asserts the court improperly based the amount of permanent support on the temporary spousal support order.

Hub's arguments are unsupported by the record. The statement of decision clearly indicates the court's spousal support award was based on

8

the section 4320 factors. The statement of decision discusses each section 4320 factor in great detail before ordering Hub to pay $2,100 a month. It then discusses Xspouse and the temporary spousal support order to provide additional context for the permanent support award. Specifically, the statement of decision states that "the court orders HUB to pay ROD spousal support in the amount of $2100.00 . . . continuing until death of either party or remarriage of ROD or termination date, whichever occurs first. The attached XSpouse [*sic*] provides the net spendable income available to both parties upon imputation of wages and salary to ROD and the spousal support order of $2100.00 a month. While 4% more of the combined spendable income is assigned to ROD, HUB's temporary support order required him to pay more than this permanent order, and HUB was still able to maintain the marital standard of living."

Put differently, Xspouse was not used to calculate spousal support. Instead, the Xspouse printout was attached to the statement of decision to show how the spousal support award calculated under section 4320 would affect the parties' net spendable income. Similarly, the family court's comment about the temporary support order does not show this order served as the basis for the permanent support award. Rather, this comment only underscored that Hub would still be able to maintain the marital standard of living under the permanent award since he had been able to maintain it under the temporary support order.

Next, Hub suggests the family court's analysis of the section 4320 factors was perfunctory, and it really based its decision on the Xspouse report and the temporary spousal support order. However, the record indicates the court carefully considered the relevant factors. The statement of decision spends more than five pages discussing the section 4320 factors and, as set

9

forth above, only briefly mentions Xspouse and the temporary spousal support order. Further, the court awarded permanent spousal support of $2,100 *before* mentioning Xspouse and temporary spousal support. This further indicates that the permanent support award was not based on Xspouse or the temporary support order. Finally, "'[i]t is a basic presumption . . . that the trial court is presumed to have known and applied the correct statutory and case law in the exercise of its official duties.'" (*Keep Our Mountains Quiet v. County of Santa Clara* (2015) 236 Cal.App.4th 714, 741.) Hub has not cited anything in the record to overcome this presumption.

II.

THE MICHELTORENA PROPERTY

Hub argues the family court erred in calculating the value of the Micheltorena property. He maintains the court improperly valued the property closer to the time of trial rather than the time of separation. Specifically, the court valued the Micheltorena property based on the testimony of Fradkin, Rod's expert, who valued it at $2.1 million as of February 2022. In contrast, Lee, one of Hub's experts, valued the property at $1.44 million as of January 2021. Hub appears to contend that the court should have relied on Lee's valuation because it was calculated closer to the separation date, April 2020, while Fradkin's valuation was calculated closer to trial, which began in November 2022.

Before analyzing Hub's argument, we must define two important concepts that Hub appears to have conflated. The first is the community's pro tanto ownership interest in the Micheltorena property. Generally, this "percentage interest is found by dividing the amount by which community property payments reduced the principal by the purchase price." (*In re Marriage of Moore*, *supra*, 28 Cal.3d at pp. 373–374.) We will refer to this

10

percentage as the community interest. The family court found the community had a 60.2 percent interest in the Micheltorena property, while Hub had a 39.8 percent separate interest. The second concept is the proper valuation of the Micheltorena property. The court found it to be worth $2.1 million as of February 2022.

Hub challenges the family court's *valuation* of the Micheltorena property. Citing *In re Marriage of Mohler* (2020) 47 Cal.App.5th 788 (*Mohler*), he contends the court should have used Lee's valuation of the Micheltorena property because it was calculated closer to the time of separation. But Hub misreads *Mohler*. As we explain below, the relevant holding in *Mohler* concerns the *community's interest* in a property, not the property's value.

In *Mohler*, the husband bought a home in 1995. He married the wife in 1998, and the couple lived in the home until their separation in 2011. After separating, the wife moved out and the husband lived in the home for over six years until the couple's dissolution trial in 2017. (*Mohler*, *supra*, 47 Cal.App.5th at p. 791.) The couple agreed that the community had a 33.66 percent interest in the home at the time of separation. (*Id*. at p. 790.) However, at trial, the wife argued the community's interest in the home continued to accrue after separation and had grown to 64.89 percent. (*Ibid*.) The family court accepted the wife's calculation, and the husband appealed. (*Id*. at pp. 790–791.)

The appellate court reversed. It held the community's interest in the home stopped accruing after separation. (*Mohler, supra*, 47 Cal.App.5th at pp. 790–791.) It explained the *Moore/Marsden* rule "is founded on a conception that community property is being 'invested' in the separate property by creating equity in it. Thus, during a marriage, only the portion of community assets that is used to pay off loan principal is relevant to

11

establishing the community interest in the property. After separation, however, the earnings and accumulations of a spouse are that spouse's separate property." (*Id.* at pp. 794–795.)

As to the home's valuation, though, the appellate court found "the trial court [was] correct to *value* the property *as of the trial date*. When the trial court determines the value of the community's property interest in a residence, the property is to be valued *as of the date of trial*, not as of the date of the parties' separation. [Citations.] Prior to a dissolution trial, a party may provide notice that, for equitable reasons, it seeks to value the property as of an earlier date that is after the separation [citation], but neither [the husband] nor [the wife] sought the use of an earlier date here." (*Mohler*, *supra*, 47 Cal.App.5th at p. 794, second and third italics added.)

*Mohler*'s ruling concerning the home's valuation was based on section 2552. Under section 2552, subdivision (a), when dividing the community estate upon marital dissolution or legal separation, "except as provided in subdivision (b), the court shall value the assets and liabilities *as near as practicable to the time of trial*." (Italics added.) Section 2552, subdivision (b), then states that "[u]pon 30 days' notice by the moving party to the other party, the court for good cause shown may value all or any portion of the assets and liabilities at a date after separation and before trial to accomplish an equal division of the community estate of the parties in an equitable manner." Like *Mohler*, other cases have found that section 2552 applies when valuing a property for purposes of a *Moore/Marsden* calculation. (See, e.g., *In re Marriage of Sherman* (2005) 133 Cal.App.4th 795, 802 ["Under [section 2552], the trial court should have valued the residence as close to the date of trial as practicable in determining the community's pro tanto interest"].)

12

Here, Hub's argument concerns the *value* of the Micheltorena property. As such, the family court did not err by valuing the property closer to the trial date instead of the separation date. (Section 2552, subd. (a); *Mohler*, *supra*, 47 Cal.App.5th at p. 794; *In re Marriage of Sherman*, *supra*, 133 Cal.App.4th at p. 802.) Hub does not argue the court improperly calculated the community's interest in the Micheltorena property, so we will not review this issue.[6]

Hub also appears to argue that both his experts' appraisals (Lee and Gardner) are more accurate than Fradkin's appraisal. But the family court is tasked with determining witness credibility and weighing the evidence. On appeal, we do not "reweigh the evidence, redetermine the credibility of the witnesses, or resolve conflicts in the testimony, and we will not disturb the judgment if there is evidence to support it." (*Harley-Davidson, Inc. v. Franchise Tax Bd.* (2015) 237 Cal.App.4th 193, 213.) As such, we cannot review the court's finding that Fradkin's appraisal was more accurate than Lee and Gardner's respective appraisals.

### III.

### DUE PROCESS

Finally, Hub contends his procedural due process rights were violated because his counsel was given insufficient time on the last day of

---

[6] Hub's opening brief implicitly accepts the family court's finding that the community has a 60.2 percent interest in the Micheltorena property. It states, "Since the community interest terminates at the date of separation and the appraisals of Mr. Lee and Mr. Gardner are more relevant, the community value on or about the date of separation would be $866,880.00 if the court accepts Mr. Lee's value and $975,000.00 if the court accepts Mr. Gardner's value." Hub calculated these values using the 60.2 percent community interest found by the court.

trial to cross-examine Rod and directly examine Hub. This purportedly prevented Hub from rebutting Rod's evidence. We find no merit to this argument.

As Hub concedes, the parties "agreed to equally divide the time for the last day of trial." He maintains this agreement was violated, and Rod used more than his allotted time. At the start of trial, though, the family court had instructed the parties to track their own time: "you guys keep track of your own time, and you're more than welcome to keep track of each other." Likewise, on the final day of trial, the court reminded the parties to "be cognizant of your time for -- you guys have to do what you do." But Hub never informed the court that he lacked sufficient time to conduct any examinations. As such, nothing in the record indicates the court did anything to deny Hub a fair hearing. (See *People v. Lowery* (2020) 43 Cal.App.5th 1046, 1054 ["[A] party must raise an issue in the trial court if they would like appellate review"].)

Hub attempts to excuse his failure to object and claims that "[w]hen it became clear that [Rod] was using more than the time allotted, the Trial Court should have interrupted and limited [Rod] to the agreed upon time." Hub fails to cite any authority for this rule or explain why such a rule would be reasonable, especially where the court told the parties to track their time. Thus, the argument is forfeited. (*Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 956.)

## DISPOSITION

The property division order is affirmed. Rod is entitled to his costs on appeal.


MOORE, ACTING P. J.

WE CONCUR:


DELANEY, J.


SCOTT, J.