Filed 6/27/14  S.M. v. E.C. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| S.M.,<br><br>　　Plaintiff and Appellant,<br><br>　　　　v.<br><br>E.C.,<br><br>　　Defendant and Respondent,<br><br>Y.M. et al.,<br><br>　　Respondents. | F065817<br><br>(Super. Ct. Nos. VFL241005 &<br>VFL239539)<br><br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Tulare County.  Jennifer Shirk, Judge.

Law Office of Marcus A. Torigian, Marcus A. Torigian for Plaintiff and Appellant.

Allen Law Firm, David W. Allen for Defendant and Respondent.

National Center for Lesbian Rights, Catherine P. Sakimura; Hatherley Law, Dale J. Hatherley for Respondent Y.M.

No appearance on behalf of Respondent Tulare County Department of Child Support Services.

-ooOoo-

1

Appellant S.M. appeals from a trial court order finding that E.C. and Y.M. are the two parents of P.C.-M. (the minor). E.C. is the minor's biological mother, Y.M. was E.C.'s registered domestic partner when E.C. conceived and gave birth to the minor, and S.M. is the minor's biological father. After determining that Y.M. and S.M. each met a statutory presumption of parentage, the trial court found that considerations of policy and logic weighed in favor of Y.M.'s parentage claim over S.M.'s parentage claim under Family Code section 7612, subdivision (b).[1]

On appeal, S.M. contends the court erred in resolving the competing claims for parental status under section 7612. He also argues the trial court judge should have recused herself pursuant to Code of Civil Procedure section 170.1.

## *FACTS AND PROCEDURAL HISTORY*

Y.M. and E.C. entered into a domestic partnership registered with the State of California in October 2006. They decided to have a child together. According to Y.M., they spent "two years off and on planning and trying to conceive [a] child." They asked S.M. to be their sperm donor. Y.M. and E.C. found a sample sperm donor contract on the Internet, made some edits and deletions, and printed two copies of their edited contract. Y.M., E.C., and S.M. signed both copies of the contract. According to S.M., Y.M. and E.C. paid him $300 for his semen samples.

Y.M. assisted E.C. in artificial insemination on two occasions in October 2008, and Y.M. believed this was how E.C. became pregnant. During the time period Y.M. and E.C. were trying to conceive, however, E.C. and S.M. were in a secret romantic relationship.[2] E.C. began having sex with S.M. in June 2008, and she believed she had conceived prior to the two artificial insemination attempts. At the time E.C. became pregnant, S.M. did not intend to be the father of the minor.

---

[1]Subsequent statutory references are to the Family Code unless otherwise indicated.

[2]Y.M. did not become aware of E.C. and S.M.'s 2008 affair until September 2010.

2.

The minor was born in June 2009. Her birth certificate lists the parents as Y.M. and E.C. The minor's last name is hyphenated, combining the last names of E.C. and Y.M.

Y.M. and E.C. separated about six months after the minor was born. S.M. moved in with E.C. in July 2010, and he began holding out the minor as his child. S.M. and E.C. originally met at work; he was a sales associate and she was a loss-prevention manager at the same store. According to S.M., he and E.C. began a serious relationship in March 2010. They did not tell anyone that the minor was S.M.'s child until E.C. transferred to a different store in the summer of 2010 because there was a rule against coworkers dating and they could have lost their jobs.

In September 2010, Y.M. initiated Tulare County Superior Court case No. 239539 (dissolution action) by filing in pro. per a "Petition for Custody and Support of Minor Children" (capitalization omitted) naming E.C. as the respondent and the minor as the subject of the action. Y.M. alleged that she and E.C. were both mothers of the minor, and Y.M. sought joint legal and physical custody and proposed a visitation schedule.

A month later, E.C. filed a petition for dissolution of domestic partnership.[3] She named the minor as a child of the relationship. E.C. also filed with the court a handwritten declaration by S.M. In the declaration, S.M. requested "a D.N.A. test to prove that [he was] the biological father of [the minor]." He wrote:

> "Although I donated my sperm to [E.C. and Y.M.] in [October] 2008 to [conceive] a child, I believe that [E.C.] was pregnant a month prior because we engaged in sexual relations. [E.C. and I] have been in a serious relationship since March 2010 and we [are pursuing] our relationship further in hopes of being married by next year. I have [actively] been in [the minor's] life since March and I am determined in having my parental rights established. I love both [E.C.] and [the minor] and we both want to

[3]E.C.'s petition is not included in the clerk's transcript, but the trial court referred to the petition in its ruling, and the parties do not dispute its existence.

3.

give [the minor] a normal and healthy [*sic*] with both [the minor's] biological parents."

In December 2010, the court entered an order awarding E.C. physical custody of the minor and awarding legal custody to E.C. and Y.M. jointly. At a hearing on the matter, Judge Jennifer Shirk noted that S.M. had filed a request for visitation and paternity but it was not in the proper form. Judge Shirk explained, "He's not a party to the action at this point. A joinder needs to be filed."

In February 2011, the court ordered a division of property between Y.M. and E.C. The court also ordered the child custody and visitation order from December 2010 to remain in effect and ordered a holiday visitation schedule.

Also in February 2011, S.M. initiated a separate action, Tulare County Superior Court case No. 11-241005, filing in pro. per a motion for child custody, visitation, and an injunctive order (paternity action). He named E.C. but not Y.M. as the respondent. He sought to establish paternity and requested joint physical and legal custody of the minor. Judge Kathryn Montejano ordered genetic testing through the Department of Child Support Services and joined Y.M. as a party to the action. Y.M. obtained counsel and filed a motion to quash S.M.'s petition and summons in the paternity action on the ground that he was not a presumed father.

In December 2011, Judge Shirk issued an order to show cause why the dissolution action and paternity action should not be ordered related. The judge later ruled the two actions were related and should be assigned to her pursuant to California Rules of Court, rule 3.300(a) and (h)(1).

In January 2012, the court heard testimony from the parties regarding Y.M. and E.C.'s efforts at artificial insemination, E.C.'s sexual relationship with S.M. in 2008, and the sperm donor agreement. The parties agreed that they all signed an agreement regarding the sperm donation, but they were unable to locate a copy of the document. Y.M. recalled that the agreement stated S.M. would have no parental rights, he would not

4.

be asked for child support, and he could not seek parental rights after the child was born. S.M. acknowledged that he signed an agreement that he would provide semen samples to E.C. until she became pregnant, and he would provide her semen again for up to two more children. He believed the agreement provided that E.C. and Y.M. would raise the child and they would not request child support from him. E.C. remembered that the agreement provided she would not collect child support from S.M. She did not remember a paragraph stating that S.M. would not be part of the child's life.

The court requested further written arguments from the parties on the issues of whether Y.M. could establish the terms of the sperm donor agreement without supplying a copy of the document and whether S.M. had standing to bring the paternity action. The court explained that it intended to give a tentative decision and then allow the parties to argue further.

After the parties submitted additional arguments and evidence, the court issued a tentative ruling on March 20, 2012. In the tentative ruling, the court indicated it would deny Y.M.'s motion to quash[4] and would determine S.M. to be the minor's second parent. In addition, the court found that the evidence did not show that S.M. made a knowing waiver of his parental rights in part because the sperm donor agreement would not have covered conception by unprotected sexual intercourse and it could not be established exactly when and how E.C. conceived. This finding was later adopted by the court and is not an issue on appeal.

The court found that Y.M. and S.M. each qualified as a presumed parent, but only one of them could be the minor's second parent. The parties do not dispute that one of the minor's two parents is her biological mother E.C. In the tentative ruling, the court reasoned:

---

[4]The court later adopted this part of its tentative ruling, and the denial of the motion to quash is not challenged in this appeal.

"Both [S.M.] and [Y.M.] are adequate parents. None of the parties have raised claims of unfitness. Both have an established relationship with [the minor]. [S.M.] is a biological parent, but was not present at birth and did not assert his parental interest until some months after [the minor] was born. [Y.M.] is not a biological parent, but assisted [E.C.] during pregnancy and was [E.C.'s] Domestic Partner when [the minor] was born.

"To this level, the legal positions between [Y.M.] and [S.M.] are nearly evenly matched. The determining factor in this matter is the ongoing stability of the family unit. [S.M.] and [E.C.] currently reside together. They intend to marry as soon as issues regarding [E.C.'s] Domestic Partnership are resolved. [E.C.] is pregnant with [S.M.'s] child and they intend to raise the new baby and [the minor] as their children. This ongoing familial relationship would best support [the minor's] needs in the future. The Court has not determined that [S.M.] is a superior parent than [Y.M.] or that [Y.M.] is, or would be, a lesser parent to [the minor]. In considering all of the factors set forth in the Family Code, based on the facts unique to this matter, the Court finds that permitting [the minor] to be raised in a family unit is determinative of parental rights."

The court believed it would be in the minor's best interest to maintain a parental relationship with all three parties, but this was not possible under current law. The tentative ruling also ordered that the previous visitation and custody orders for the minor between Y.M. and E.C. were to remain in effect.

At a hearing on March 22, 2012, Y.M.'s counsel asked for an evidentiary hearing on the issue whether Y.M. or S.M. should be the second parent of the minor under section 7612, subdivision (b). The parties agreed to a contested hearing on all issues, which occurred on May 22 and 23, 2012.

At the contested hearing, Y.M.'s counsel elicited testimony from S.M. that he had another child, who was five years old at the time of the hearing. S.M. and the child's mother had an "on-and-off relationship," and by the time he started his affair with E.C., "she had moved out of [his] apartment." S.M. thought his initial sexual relationship with E.C. ended a couple months after she became pregnant. He started going to lunch with

6.

E.C. and "hanging out" again about four months after the minor was born. He started staying over at E.C.'s house in March 2010.

During E.C.'s pregnancy, S.M. did not participate in any preparation for the minor's arrival, he was not present at her birth, he did not sign a voluntary declaration of paternity at the hospital, and he did not offer any financial support to E.C. or Y.M. for either the pregnancy or the birth. He learned that E.C. gave birth at the same time other coworkers at the store where they both worked learned the news. He first held the minor in his arms in March 2010. S.M. would see E.C. with the minor at work, but he did not acknowledge her as his child until the minor was one year old. He explained that he could not acknowledge the minor to protect his and E.C.'s jobs. He did not acknowledge the minor as his child to his own family until the summer of 2010. He was aware that Y.M. paid child support to E.C. for the minor.

S.M. believed that the sperm donor agreement he signed meant that he was relieved of financial responsibility. He also believed he was giving up custodial rights. Asked whether it was his intention at the time the minor was conceived to give up custodial rights, he responded: "Yes. We were both in a relationship. I didn't want to complicate [E.C.'s] life." This remained his intent until a couple months after the minor was born. At that point, he and E.C. "got heavier in [their] relationship."

S.M. agreed that the minor did not have any problem going back and forth between E.C.'s and Y.M.'s houses. He agreed that the minor had a strong attachment to Y.M. and viewed her as one of her mothers. He believed the minor loved Y.M. very much, but the minor was young enough to overcome being cut off from Y.M.

E.C. and S.M. have had a daughter since they moved in together. S.M. was present when the child was born, and he provided financial and emotional support for E.C. during the pregnancy.

E.C. testified that, at the time she became pregnant with the minor, it was her intention that she and Y.M. would raise the child together. She agreed that the minor

7.

seemed happy when Y.M. would pick her up for visits, and the minor had a bond with Y.M. and liked to spend time with her. E.C. believed it was in the minor's best interest that "she should be around [Y.M.]" because the minor had "grown to enjoy her time with her."

E.C. also believed there was a bond between S.M. and the minor. S.M. had participated in the minor's upbringing since he moved in with E.C. in July 2010. He changed her diapers, fed her, and helped with potty training. E.C. testified that S.M. plays with the minor and "does the daddy thing."

Y.M. testified she was present at the minor's birth and immediately held the minor out to the world as her child. Y.M. insured the minor through her health insurance and named the minor as her beneficiary for life insurance and work-related benefits. At the time of conception, it was Y.M.'s intent that the minor would be raised in a family unit consisting of Y.M., E.C., and the minor. E.C. told Y.M. that was her intent too. After the minor was born, the three of them lived together for about eight months. Y.M. began paying child support voluntarily after she and E.C. separated. E.C. first told Y.M. that she had changed her mind about raising the minor with Y.M. as the other parent when the minor was just over one year old.

S.M.'s counsel argued, among other things, that over the previous two years, S.M. had spent a significant amount of time with the minor on a daily basis interacting with her as a family member. S.M.'s counsel pointed out that if Y.M. prevailed and E.C. were to die, then S.M. would have no right to his child and the minor would have no legal relationship to her siblings. E.C.'s counsel joined in S.M.'s argument.

Y.M.'s counsel asserted that Y.M. had demonstrated a greater commitment to the minor than S.M. had. For example, Y.M. had accepted financial responsibility for the minor since conception, while S.M. originally "consciously wanted nothing to do with financial responsibility." Y.M.'s counsel argued: "There is no law that says [S.M.] has to be parent number 2. As a matter of fact, there is really good law that says that at the very

least [S.M.] and [Y.M.] are on equal footing.  And shouldn't we look at these other factors such as [E.C.] and [Y.M.'s] intent to conceive this child from the very beginning?  That was their intent."  He continued, "All of the rational factors that should be considered here, commitment, the intent of the parties, financial responsibility, primary attachment, potential risk of harm to [the minor], all of those factors favor Y.M."

On July 6, 2012, the court issued its ruling.  It did not adopt its tentative ruling with respect to parentage and instead found that Y.M. and E.C. are the minor's legal parents.  The court explained:

> "[Y.M., S.C. and E.C.] are each a presumed parent and each have established a parental relationship with the child.  Each seeks to maintain that relationship in these proceedings.  Under existing legal authority [citations], [the minor] is limited to two parents and the Court is required to resolve the conflict between presumed parents under Family Code Section 7612(b).

> "Although many scholars believe that limiting a child to two parents is unfair in light of changing social views, it is the responsibility of the Legislature and not the Trial Courts to make policy determinations.  Accordingly, this Court must resolve the conflicting claims of [Y.M.] and [S.M.] by determining which claim on the facts is founded on the weightier consideration of policy and logic pursuant to Family Code Section 7612(b).  In its tentative ruling dated March 20, 2012, the Court struggled to find a factor which tipped those scales revealing the weightier factor.  At that time, the Court settled on the fact that [S.M.] was in a committed relationship with [E.C.] and that it would be in the child's best interest to be raised in an intact family.

> "However, the testimony of the parties at trial refutes the Court's impression.  The Court is still convinced that [S.M., E.C. and Y.M.] are good parents and that [the minor] is fortunate to have them in her life.  However, the Court was struck by [S.M.'s] lack of commitment to the mother of his pre-school-age son, during his initial relationship with [E.C.], describing the relationship as 'on again off again.'[5]  At the time [the

---

[5]The dissent suggests we are relying on S.M.'s "on-and-off relationship" with the mother of another of his children as a factor weighing against his parentage claim.  Our review, however, does not involve reweighing the considerations of policy and logic that

minor] was conceived, understanding that she may not have been conceived as a result of the artificial insemination agreement, he made no effort to assist [E.C.] during the pregnancy. He was not present at her birth. Even as he developed a relationship with [the minor] from the time she was a few months old, he kept his relationship with her a secret. He chose to preserve personal and employment relationships over acknowledgement of his child.

"There is no doubt that [S.M.] loves [the minor] and that he has been supporting her financially since [E.C.] moved in with him. There is also no doubt that he will always play a role in her life and will always be her father. However, the Court is limited to choosing between [S.M. and Y.M.] in determining who [the minor's] other legal parent will be. Being a parent is a joy, but it is also a tremendous commitment and responsibility. [Y.M.] has demonstrated that since conception she was completely committed to this child, not just when her relationship with [E.C.] was good, and not just when it was convenient in terms of personal or employment pressures. While commitment remains the weightier consideration, the evidence demonstrates that [Y.M.'s] commitment from day one exceeds [S.M.'s] current commitment."

## *DISCUSSION*

## I.     *The trial court did not abuse its discretion in determining that Y.M. is the minor's second parent under section 7612, subdivision (b)*

Section 7611 provides various statutory presumptions of parentage. Under subdivision (a) of section 7611, a person is presumed to be the natural parent of a child if the person and the child's natural mother were married to each other and the child is born during marriage.[6] Although Y.M. and E.C. were not married at the time the minor was

_____

the trial court weighed in reaching its determination. To the extent it is suggested that the trial court abused its discretion by considering S.M.'s "on-and-off relationship," we believe the dissent's focus on this narrow phrase overlooks the totality of the trial court's concern, namely S.M.'s apparent *lack of commitment* to being a parent to another of his children.

[6]We note that, at the time the trial court made its ruling, section 7611 referred to a "man" and "presumed father" and used the possessive pronoun "his." (Former § 7611, as amended by Stats. 2004, ch. 775, § 1.) The statute has since been amended to employ the terms "person," "presumed parent," and "his or her." (§ 7611, as amended by Stats. 2013, ch. 510, § 3, eff. Jan. 1, 2014.) Even before the amendment, however, the California

born, they were in a registered domestic partnership, and domestic partners are entitled to all the rights, benefits, responsibilities, and obligations granted to and imposed upon spouses by statute or any other source of law. (§ 297.5, subds. (a).) S.M. does not dispute that Y.M. is a presumed parent under this subdivision.

Under subdivision (d) of section 7611, a person is a presumed parent if he receives the child into his home and openly holds out the child as his child. (See, *ante,* fn. 5.) The trial court found S.M. to be a presumed parent under this subdivision, and Y.M. did not cross-appeal and therefore does not challenge the finding that S.M. qualifies as a presumed parent.

In his appellate briefing, S.M. asserts the trial court erred in determining that Y.M. rather than S.M. is the minor's second parent under section 7612, subdivision (b), which provides:

> "If two or more presumptions arise under Section … 7611 that conflict with each other, … the presumption which on the facts is founded on the weightier considerations of policy and logic controls." (§ 7612, subd. (b).)

No statutory presumption of parentage is given categorical preference over any other. (*Craig L. v. Sandy S*. (2004) 125 Cal.App.4th 36, 50 (*Craig L.*).) For example, the presumption provided to spouses under section 7611, subdivision (a), will not always be weightier than the presumption provided to persons who take children into their homes under subdivision (d). (*Craig L., supra,* at pp. 50, 52.) Nor does the fact that one presumed parent is also the biological father automatically defeat another presumed parent's claim for parental status. (*In re Jesusa V*. (2004) 32 Cal.4th 588, 606 (*Jesusa V*.).) Rather, "the trial court must make its determination under section 7612 on a case-by-case basis." (*Craig L.*, *supra*, at p. 52.) "In resolving such a conflict, the trial court must at all times be guided by the principle that the goal of our [parentage] statutes is 'the

Supreme Court recognized that a woman could be a presumed parent under section 7611. (*Elisa B. v. Superior Court* (2005) 37 Cal.4th 108, 124-125.)

11.

protection of the child's well being.'" (*Ibid*., quoting *Adoption of Kelsey S*. (1992) 1 Cal.4th 816, 845.)

We review for an abuse of discretion a trial court's determination of parental status where there are competing presumed parents. (*Jesusa V., supra,* 32 Cal.4th at p. 606; *Gabriel P. v. Suedi D*. (2006) 141 Cal.App.4th 850, 864.) S.M. argues that the standard of review is de novo because statutory interpretation is a question of law. We reject this argument because S.M.'s appeal does not require us to decide the meaning of any statute. The parties do not dispute that (1) Y.M. and S.M. both qualified as presumed parents under section 7611, and (2) the trial court was required to resolve their competing claims of parental status under section 7612. Further, as Y.M. points out, S.M. does not claim the court used the wrong legal standard under section 7612; "rather, he disagrees with the court's ultimate determination, which it made by applying the law to the facts of this case."

We now turn to the trial court's ruling that Y.M., not S.M., is the minor's second parent. As we have described, the trial court's task was to determine, between Y.M.'s and S.M.'s claims of presumed parentage, which was "founded on the weightier considerations of policy and logic" on the facts of the case. (§ 7612, subd. (b).) The court considered the evidence and found that Y.M. and S.M. had each "established a parental relationship" with the minor and further found they were both good parents. The court "struggled to find a factor which tipped [the] scales .…" Initially, it settled on "the ongoing stability of the family unit" (of E.C., S.M., the minor, and her baby sister) as the determining factor, and this factor weighed in favor of designating S.M. as the second parent. After hearing two days of testimony, the court reconsidered and determined that commitment to the child was the weightier consideration, and this consideration weighed in favor of Y.M. because she demonstrated complete commitment to the minor since conception. S.M., in contrast, began his sexual relationship with E.C. and then provided sperm for artificial insemination without any intent to be a father to the resulting child.

We see no abuse of discretion in the trial court's determination. Certainly, commitment to the well-being of the child and intention to be a parent may be relevant factors in weighing the competing presumptions of parentage, and the evidence supports the court's finding that Y.M.'s commitment to the minor since conception has been greater than S.M.'s. (See *E.C. v. J.V.* (2012) 202 Cal.App.4th 1076, 1085 [presumed parent under § 7611, subd. (d), is "someone who has demonstrated an abiding commitment to the child and the child's well-being, regardless of his or her relationship with the child's other parent"]; *Johnson v. Calvert* (1993) 5 Cal.4th 84, 93 [where two women present acceptable proof of maternity, deciding who is legal mother requires "enquiring into the parties' intentions"].)

In arguing that the trial court erred, S.M. asserts that "the determining factor in this matter should be the ongoing stability of the family unit." But he offers no authority for the proposition that the trial court was *required* to use the consideration of ongoing stability of the family unit as the determining factor. To the contrary, S.M. recognizes, "'[N]o single factor—whether social or biological—controls resolution of the conflict between competing presumed fathers'" (or competing presumed parents), quoting *Craig L.*, *supra*, 125 Cal.App.4th at page 52. This means the facts that S.M. and E.C. were living together and intended to get married at the time of the evidentiary hearing were not necessarily determinative to defeat Y.M.'s competing claim of parentage. Instead, the trial court was required to "make its determination under section 7612 on a case-by-case basis … guided by the principle that the goal of our [parentage] statutes is 'the protection of the child's well being.'" (*Ibid*.) Here, the record—including the tentative ruling, the evidentiary hearing transcripts, and the final ruling—demonstrates the court properly made its determination based on the particular facts of this case and with the child's well-being in mind.

S.M. asserts that "his current biological and existing relationship with [the minor] provides her with … better social and emotional strength and stability than" Y.M.'s

relationship with the child. He does not point to any evidence in the record to support this assertion. More important, this assertion was an argument for the trial court to consider in making its determination. "We do not substitute our own judgment for that of the trial court …." (*In re Marriage of Bodo* (2011) 198 Cal.App.4th 373, 384.) Our role is only to determine whether the trial court abused its discretion, and, as we have concluded, we see no abuse of discretion in this case.

S.M. also refers to his constitutional rights, suggesting that his biological connection to the minor, together with his contact with her, establish "his constitutional right to be declared her father and second parent under the law." Yet, he recognizes that biology is not determinative of legal parentage. Curiously, he even cites *Miller v. Miller* (1998) 64 Cal.App.4th 111, a case in which we affirmed a trial court's ruling against an appellant who, like S.M., was the biological father of a child born during the mother's marriage to a different person and who subsequently married the mother. (*Id*. at pp. 114-117.) Our court specifically rejected the appellant's argument that he had a substantive due process right to establish he was the child's biological father. (*Id*. at p. 119.)

S.M. argues that "a purported biological father who can allege facts giving rise to [section] 7611 presumed father status … may also have 'an interest which may well be subject to protection under the due process clause of the United States Constitution,'" quoting *Craig L.*, *supra*, 125 Cal.App.4th at page 47. *Craig L.* does not stand for the proposition that a biological father who also has established contact with the child has a constitutional right to be designated the legal parent of the child.

In *Craig L.*, the petitioner, Craig, had an affair with a married woman and she became pregnant. A routine blood test showed the woman's husband could not have been the biological father, and Craig was the only other possible biological father. (*Craig L.*, *supra*, 125 Cal.App.4th at p. 44.) According to Craig, he and his wife agreed to participate in the child's upbringing. Craig's wife took care of the child three to four days a week and when the child was a few months old, the child stayed overnight at Craig's

14.

house one day each week. Craig also claimed that he held out the child to his family and friends as his son. When the child was about 13 months old, the mother informed Craig that she no longer needed his and his wife's childcare services. Craig then filed a petition alleging he was the child's presumed father. He sought DNA testing and visitation. (*Ibid.*) The husband of the child's mother then moved to quash Craig's petition. The trial court granted the motion, finding, "'pursuant to Statute, Decisional Law, and California's strong public policy to maintain the integrity of a child's legitimacy, Craig does not have standing to establish a paternal relationship.'" (*Id.* at p. 45.)

The Court of Appeal reversed, holding that Craig had standing to initiate his parentage claim under section 7630, subdivision (b).[7] (*Craig L.*, *supra*, 125 Cal.App.4th at p. 45.) The court rejected the husband's argument that Craig's claim of presumed parentage based on taking the child into his home and holding the child out as his own (§ 7611, subd. (d)) was barred by the fact the mother was married and lived with her husband at the time of conception.[8] (*Craig L., supra,* at p. 47.) Thus, the court held that Craig could pursue his parentage claim *as a matter of statute*. The holding was not based on an alleged constitutional right. The court did observe that Craig's relationship with the child "not only supports a statutory right under section 7611, subdivision (d), but an interest which may well be subject to protection under the due process clause of the United States Constitution." (*Ibid.*) But the court did not hold—or even suggest—that Craig had a due process right to a determination that he *was* the child's legal father.

---

[7]Section 7630, subdivision (b), provides: "Any interested party may bring an action at any time for the purpose of determining the existence or nonexistence of the parent and child relationship presumed under subdivision (d) or (f) of Section 7611."

[8]The husband in *Craig L.* argued that a husband's presumption of paternity under section 7540 would bar a claim of parentage by a biological father. (*Craig L., supra*, 125 Cal.App.4th at p. 46.) Section 7540 provides, "Except as provided in Section 7541, the child of a wife cohabiting with her husband, who is not impotent or sterile, is conclusively presumed to be a child of the marriage."

15.

The *Craig L.* court went on to recognize that the husband, too, had standing to assert a parentage claim under section 7611, subdivision (a). (*Craig L.*, *supra*, 125 Cal.App.4th at p. 47.) The court remanded the case to the trial court to determine whether Craig was, in fact, a presumed parent under section 7611, subdivision (d). (*Craig L., supra,* at p. 53.) The court did *not* suggest that if Craig was a presumed parent, then he would have a constitutional right to be designated the legal father by virtue of biology and his contact with the child. Instead, the *Craig L.* court contemplated that, if Craig was a presumed father, the trial court would then weigh Craig's and the husband's competing claims of parentage under section 7612. (*Craig L., supra,* at p. 53.)

At most, *Craig L.* may be read to suggest that a biological father who also has a relationship with the child has a due process right to *standing* to pursue a parentage claim. Here, the trial court held that S.M. had standing to bring his paternity action as it denied Y.M.'s motion to quash and found S.M. met the statutory presumption of parentage. *Craig L.*, however, cannot be read to mean that S.M. had a due process right to *prevail* in the weighing of competing parentage claims under section 7612. Accordingly, we reject S.M.'s suggestion that he has a constitutional right to a determination that he is the second parent of the minor.

Finally, we consider the possibility of remand in this case. In their appellate briefing, the parties did not suggest that a child may have more than two legal parents. (See *In re M.C.* (2011) 195 Cal.App.4th 197, 214 [noting our Supreme Court rejected dual paternity or maternity where recognition would result in three parents], abrogated by statute, § 7601 (Stats. 2013, ch. 564).) Effective January 1, 2014, however, section 7612 was amended to allow a court, in an appropriate action, to "find that more than two persons with a claim to parentage under this division are parents if the court finds that recognizing only two parents would be detrimental to the child." (§ 7612, subd. (c).) After briefing was filed, we invited the parties to submit letter briefs on the impact of this amendment, if any, on the case.

In her response to our invitation, Y.M. asserts the amendment had no effect on the appeal because an appellate court must apply the law as it existed at the time the challenged ruling was entered. (§ 4, subd. (e); *In re Marriage of Heikes* (1995) 10 Cal.4th 1211, 1214, fn. 1 [validity of trial court's judgment was governed by statutory provisions then in force].) S.M. suggests the case should be remanded to the trial court for reconsideration under the new law,[9] but he offers no authority for his suggestion.

Section 4, subdivision (e), provides: "If an order is made before the operative date [of a new law], or an action on an order is taken before the operative date, *the validity of the order or action is governed by the old law and not by the new law*. Nothing in this subdivision precludes proceedings after the operative date to modify an order made, or alter a course of action commenced, before the operative date to the extent proceedings for modification of an order or alteration of a course of action of that type are otherwise provided in the new law." (Italics added.)

Here, we have reviewed the trial court's determination under the law as it existed and have found no basis for reversal. Indeed, S.M. has expressly abandoned any claim of error pertaining to the court's determination that Y.M. and E.C. are the child's two parents. S.M. has offered no legal authority for his request that we remand the case for reconsideration even though we are affirming the court's ruling.

Nonetheless, we observe that "the general directive in section 4 favors retroactive application of changes in the Family Law Code, despite the general rule that favors prospective application of changes in the law." (*Velez v. Smith* (2006) 142 Cal.App.4th 1154, 1169.) Subdivision (c) of section 4 provides, "Subject to the limitations provided in this section, [a] new law applies on the operative date to all matters governed by the

---

[9]During oral argument, S.M. went further and appeared to withdraw his original appellate claim. Asked whether he was abandoning his claim that the trial court erred in determining that Y.M. was the child's second parent, S.M.'s counsel responded in the affirmative.

new law, regardless of whether an event occurred or circumstance existed before, on, or after the operative date, including, but not limited to, commencement of a proceeding, making of an order, or taking of an action."

Therefore, while we have no grounds for reversing the trial court's decision that Y.M. and E.C. are the child's parents, because the new law expands the court's discretion to "find that more than two persons with a claim to parentage under this division are parents if the court finds that recognizing only two parents would be detrimental to the child" (§ 7612, subd. (c)), we believe a limited remand is appropriate in this case. As noted earlier, in its tentative ruling, the court originally was of the opinion that S.M. should be found to be the second parent. Even after the evidentiary hearing, the court had "no doubt" that S.M. "will always be her father." Earlier in its ruling, the court recognized that "many scholars believe that limiting a child to two parents is unfair in light of changing social views, [but] it is the responsibility of the Legislature and not the Trial Courts to make policy determinations. Accordingly, this Court must resolve the conflicting claims .…" The Legislature has now spoken on this important policy issue. Given the general directive in section 4 favoring retroactive application of changes in the Family Code, and the trial court's apparent frustration in being limited to designating two parents for the child, a limited remand to allow the court to consider whether S.M. may be the child's third parent under current section 7612, subdivision (c), is appropriate. Nothing in this opinion is intended to suggest how the court should rule on this limited remand.

## II.     *The issue whether the judge should have recused herself has been waived*

Finally, S.M. claims the trial court should have refused to hear the case pursuant to Code of Civil Procedure section 170.1. He asserts, "Given the facts and circumstances surrounding this matter, and matters discussed on the record concerning Judge Jennifer Shirk's prior contact with the litigants in this case she should have recused herself .…" He then "requests that this Court consider whether in the interest of justice it should direct

18.

that further proceedings be heard before a trial judge other than the judge whose judgment or order was reviewed by the appellant court." S.M. offers no analysis or authority, other than Code of Civil Procedure section 170.1 itself, to support his request. Nor does he attempt to describe the "facts and circumstances surrounding this matter" to which he refers. Because S.M. has not properly raised the claim, we treat it as waived. (*Associated Builders & Contractors, Inc. v. San Francisco Airports Com.* (1999) 21 Cal.4th 352, 366, fn. 2 [contention not properly raised where appellant "fails to provide any analysis or argument in support of the assertion"].)

Further, Y.M. explains that it was she who raised the issue of recusal on May 22, 2012, based on the fact that Judge Shirk had represented E.C.'s father more than 20 years earlier. When the issue was raised, S.M. did not argue that Judge Shirk should be recused. As a result, his claim fails for the additional reason that he failed to preserve the claim for appellate review. (*In re Sabrina H*. (2007) 149 Cal.App.4th 1403, 1419.)

### *DISPOSITION*

The judgment declaring Y.M. and E.C. to be the child's parents is affirmed. The matter is remanded to the trial court for the limited purpose of considering the amendment of section 7612 on the issue of legal parentage, i.e., whether denying S.M.'s claim to legal

parentage would be detrimental to the child.[10]  Respondent Y.M. shall recover her costs on appeal.

_____
Sarkisian, J.[*]

I CONCUR:

_____
Peña, J.

---

[10]In light of the views expressed in the concurrence and dissent (conc. & dis. opn. of Poochigian, J., p. 1, fn. 1), we iterate that nothing in this opinion is intended to suggest how the court should rule on this limited remand.

[*]Judge of the Superior Court of Fresno County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**POOCHIGIAN, J., Concurring and Dissenting.**

I respectfully dissent from the court's decision to affirm the judgment.[1]

This case demonstrates the chasm that can develop between the legal definition of a word and its common meaning.  Most people would likely be surprised to learn that the law does not regard a good father who is living with, raising and financially supporting his biological daughter to be her "parent."  Of course, we must credit the statutory definition of a word over its popular meaning when the two conflict.[2]  Fortunately, this is not such a case because S.M. is his daughter's "parent" under any reasonable definition of that word.[3]

---

[1] I concur in the court's decision to remand the case for the trial court to determine "whether denying S.M.'s claim to legal parentage would be detrimental to the child." (Maj. opn., *ante*, at p. 19.)  However, unlike the majority, I would find that denying S.M.'s claim would likely be detrimental to the child.  Consider a scenario in which E.C. predeceases S.M.  In that situation, the child could be taken away from the home where she has lived with her biological father and siblings for years.  The obvious solution is to take this opportunity to accurately characterize the reality of S.M.'s relationship with his daughter.

[2] Though we should strive for a resolution that comports with the legal *and* popular definitions of terms used in statutes.  (See *In re Estate of Curry* (1870) 39 Cal. 529, 531.)

[3] In a footnote, the majority notes S.M.'s counsel "appeared" to abandon his claim that he was the minor's second parent.  (Maj. opn., *ante*, at p. 17, fn. 9.)  The majority does not seem to afford dispositive weight to this fact, and addresses the merits of S.M.'s claim.  In any event, a court may refuse to dismiss an appeal even where appellant abandons it.  (E.g., *People v. Nelms* (2008) 165 Cal.App.4th 1465, 1471.)  Moreover, "a reviewing court 'is not bound to accept concessions of parties as establishing the law applicable to a case.' [Citation.]"  (*Bell v. Tri-City Hospital Dist.* (1987) 196 Cal.App.3d 438, 449, disapproved on another point by *State v. Superior Court* (*Bodde*) (2004) 32 Cal.4th 1234, 1244.)  In my view, S.M.'s arguably "erroneous concession cannot and should not prevent this court from applying sound legal principles to the objective facts disclosed by the record" (*ibid*.), especially when the interests of a nonrepresented child are involved.

1

A. The Facts and "Considerations of Policy and Logic" on which S.M.'s Presumptions are Founded are Profound

Family Code section 7612, subdivision (b)[4] provides that when there are conflicting presumptions, "the presumption which on the facts is founded on the weightier considerations of policy and logic controls." S.M.'s presumptions, on the facts, are clearly founded on weightier considerations of policy and logic.

First, S.M. is the child's biological father. I view this as a very weighty "consideration[] of policy and logic." (§ 7612, subd. (b).) "The … interest … of a man in the children he has sired and raised, undeniably warrants deference and, absent a powerful countervailing interest, protection…." (*Stanley v. Illinois* (1972) 405 U.S. 645, 651.) Indeed, in *In re Jesusa V.* (2004) 32 Cal.4th 588 (*Jesusa V.*), three California Supreme Court justices concluded that biology is *always* determinative in cases of dueling claims to parentage of a child under the age of two. "[S]ections 7541 and 7554 reflect the Legislature's view that when a paternity dispute between two presumptive fathers involves a child less than two years old, biology is the 'weightier consideration[] of policy and logic' under section 7612, subdivision (b)…." (*Id.* at p. 629 (dis. opn. of Kennard, J.).) "… California's statutory scheme … *requires* courts to determine paternity in accordance with biological fact even where a man enjoys a so-called conclusive presumption of paternity…." (*Id.* at p. 633 (dis. opn. of Chin, J.), original italics.) Though the majority in *Jesusa V.* ultimately concluded that biology is not *always* determinative in every case (*id.* at p. 606), they agreed courts are "obliged" to consider biology under section 7612, subdivision (b), along with other factors. (*Id.* at p. 608.)

Wherever biology belongs in the hierarchy of "considerations of policy and logic" (§ 7612, subd. (b)), it is certainly entitled to more deference than it has been afforded here.

---

[4] All future statutory references are to the Family Code unless otherwise noted.

Fortunately, our task in this case is made far easier by the fact that S.M. has several profound considerations in his favor beyond biology. Not only is S.M. the child's biological father, he also: (1) received her into his home and openly held her out as his own; (2) has been in a relationship with her mother for years (and is now married to her mother); (3) has lived with her and her mother since July 2010; (4) financially supports her; and (5) *was found to be a good parent by the trial court*.[5] (Maj. opn., *ante*, at pp. 7, 9–11.)

I cannot imagine any relevant considerations of policy and logic weightier than these. But even if there were some theoretical combination of factors that could outweigh those in favor of S.M., it certainly is not present here, as I will now discuss.

B.    The Facts and "Considerations of Policy and Logic" on Which Y.M.'s Presumption is Founded are Weaker than S.M.'s

Against the factors outlined above, we must weigh the facts and "considerations of policy and logic" on which Y.M.'s presumption is founded. (§ 7612, subd. (b).) Y.M.'s presumption arises from section 7611, subdivision (a), which applies to individuals married to the biological mother when the child is born. (§ 7611, subd. (a).) This consideration is certainly not meaningless. Y.M. has clearly developed a special bond

---

[5] The majority minimizes the combined weight of these considerations by characterizing them as individually insufficient to compel a conclusion. (E.g., maj. opn., *ante*, at p. 11 [fact that parent is biological father does not "automatically defeat" another presumed parent's claim]; *id.* at p. 13 [no authority for notion that court was required to consider family stability as determinative]; *ibid.* [S.M.'s relationship with child's mother "not necessarily determinative"]; *id.* at p. 14 ["biology is not determinative"].) It is true that the law currently provides that no *single* factor controls in section 7612's weighing process. But it is the cumulative weight of the "considerations of policy and logic" that is relevant to section 7612, subdivision (b)'s analysis. Here, the factors in favor of S.M. clearly outweigh those in favor of Y.M. It should also be noted that the same reasoning could be applied to undermine Y.M.'s claim. (See *Craig L. v. Sandy S.* (2004) 125 Cal.App.4th 36, 50, 52 [presumption under § 7611, subd. (a) does not necessarily prevail over presumption under subd. (d)].)

3

with the child and hopefully their relationship will continue. But, as discussed below, the facts on which her statutory presumption is founded do not overcome those in favor of S.M.

The policy behind Y.M.'s presumption is "the state's traditional interest in 'upholding the integrity of the family.' [Citation.]" (*Brian C. v. Ginger K.* (2000) 77 Cal.App.4th 1198, 1217.) This policy consideration is important. But it is not served by declaring Y.M. the parent here because Y.M. and E.C.'s "family unit has been dissolved …."[6] (*In re Lisa R.* (1975) 13 Cal.3d 636, 650. See also *In re M.C.* (2011) 195 Cal.App.4th 197, 215 ["marriage during which the child was born no longer exists"].) In fact, the policy considerations underlying Y.M.'s presumption actually support S.M.'s claim to parentage. The extant marital family here is the relationship between S.M., E.C., and their two daughters.[7] The weight attributable to the policy of upholding the integrity of the family should be applied to S.M.'s side of the scale.

C.      The Fact that S.M. is Not a Perfect Parent Does Not Negate the Fact that He is a Parent

In arriving at a contrary conclusion, the majority relies primarily on the lower court's determination that "commitment to the child was the weightier consideration" and that "this consideration weighed in favor of Y.M. because she demonstrated complete commitment to the minor since conception." (Maj. opn., *ante*, at p. 12.) The trial court also found that S.M. had "developed a relationship with [the minor] from the time she was a few months old," but he had "kept his relationship with her a secret." (*Id.* at p. 10.) Finally, the trial court found that S.M. did not assist E.C. during the pregnancy, and had

---

[6] Y.M. and E.C. separated approximately six months after the child was born. (Maj. opn., *ante*, at p. 3.)

[7] Since S.M. moved in with E.C. in July 2010, he has been actively raising the child. (Maj. opn., *ante*, at p. 8.) He changes her diapers, feeds her, helps with potty training and, as her mother put it: "[D]oes the daddy thing." (*Ibid.*)

4

previously been in an "on again off again" relationship with the mother of his preschool-aged son.

S.M.'s conduct may not have been ideal, but neither is it the type of appalling behavior other courts have relied on in rejecting a biological father's parentage claim. (See, e.g., *Jesusa V.*, *supra*, 32 Cal.4th at p. 610.)[8] Moreover, S.M. explained that he could not acknowledge the child as his own without jeopardizing his job and E.C.'s job.[9] Additionally, S.M.'s initial failure to become involved in the child's life was apparently short-lived. He now lives with and raises the child in a family home while supporting the child financially. While his conduct during the first few months of the child's life may disqualify S.M. from being declared a *perfect* parent, they do not change the fact that he is the child's parent. Indeed, the majority's reasoning unfortunately subjects biological parents to the "risk that, although they have a loving, healthy, and well-developed relationship with their children, some court may [deny their parentage claim] based on the conclusion that another [person] who qualifies as a presumed [parent] would be a better [parent]…." (*Id.* at p. 634 (dis. opn. of Chin, J.).)

---

[8] The *Jesusa V.* majority rejected the biological father's claim to parentage and noted "it is difficult to imagine conduct more destructive of the parent-child relationship than [biological father's] violent rape of Jesusa's mother while Jesusa was present in the home. [Citation.]" (*Jesusa V.*, *supra*, 32 Cal.4th at p. 610.) Of course, there is no analogous consideration present in this case. Indeed many of the factors the majority cited in upholding the nonbiological parent's claim in *Jesusa V.* are in S.M.'s favor here: He was in a relationship with the child's mother; the child spent " 'a considerable amount of time' " in his home and lived with him " 'for a significant amount of time during her young life' "; and that "a family unit existed there to protect the child." (*Id.* at pp. 608–609.)

[9] There was some evidence that E.C. initially intended to raise the child without S.M.'s involvement pursuant to the alleged sperm donor contract. It does not appear that S.M. has identified this as one of the reasons for his initial failure to publicly acknowledge the child, but this evidence does provide another possible explanation.

5

D.     <u>Under the Balancing Test of Section 7612, Subdivision (b), the Considerations to be Weighed are Limited to Those Underlying the Litigants' Presumptions of "Fatherhood"</u>

I am also generally concerned that courts have begun to balance competing presumptions in a manner unmoored from the statutory language of section 7612. At first glance, the statute's nebulous phrase "weightier considerations of policy and logic" seems to suggest courts have limitless discretion to simply pick their favorite "parent." But the statute's preceding phrase specifically limits the relevant "considerations of policy and logic" to those that underlie the applicable statutory presumptions of parenthood.

This is not to say the statute does not afford courts considerable discretion. But the discretion is to determine which factors are weightier, not which factors should be considered in the first place.[10] In the calculation to be made under section 7612, subdivision (b), the Legislature has chosen the variables and the court determines their values.

Consequently, I do not join in the majority's reliance on certain factors, such as S.M.'s prior "on again off again" relationship with another woman.[11] I do not see that as a "consideration[]" upon which S.M.'s "presumption … is founded." (§ 7612, subd. (b).)

---

[10] For example, I believe it would be improper for a court to consider a potential parent's level of education because that is not a "consideration[]" upon which any presumption of parenthood "is founded." (§ 7612, subd. (b).)

[11] The majority believes my focus on this consideration "overlooks the totality of the trial court's concern, namely S.M.'s apparent lack of commitment to being a parent to another of his children." (Maj. opn, *ante*, at p. 10, fn. 5, italics removed.) But evidence that S.M. had an "on again off again" relationship with his son's mother does not necessarily speak to his level of commitment to the child. Surmising that S.M. lacked commitment to his son because he had an "on again off again" relationship with his mother is an inference unsupported by the evidence. If anything, the totality of the evidence undermines such a conclusion. S.M. testified that when the child's mother moved out of his apartment, he still had visitation with the child. He also testified that "it was in both of our best interest[s] to part ways and *both care for*" the child.

6

E.    Constitutional Implications

I am also hesitant to dismiss S.M.'s constitutional claims. I agree that existing authority has not held "that a biological father who also has established contact with the child has a constitutional right to be designated the legal parent of the child." (Maj. opn., *ante*, at p. 14.) Indeed, parental rights do not "spring full-blown from the biological connection between parent and child" and instead "require relationships more enduring." (*Caban v. Mohammed* (1979) 441 U.S. 380, 397.)[12] But what happens when a father, like S.M., *has* established an enduring relationship with his biological daughter? It is no answer to say that the constitution does not protect *every* father's relationship with his offspring. The important question here is: Does the constitution protect *this* father's relationship with his biological daughter?

At *some point*, a father's actual relationship with his biological child becomes sufficiently profound to "warrant[] deference and, absent a powerful countervailing interest, protection…." (*Stanley v. Illinois* (1972) 405 U.S. 645, 651. See also *Michael M. v. Giovanna F.* (1992) 5 Cal.App.4th 1272, 1282–1283.) Where is that point and has it been reached here?

While it is important to note these constitutional implications, ultimately I would avoid the constitutional issue by concluding that S.M.'s presumptions prevail under section 7612, subdivision (b).

---

Moreover, even if S.M. had shown less than total commitment to his son, I would still conclude his presumptions of parenthood as to his daughter are founded on weightier considerations of policy and logic.

[12] The negative implication of *Caban*'s oft-quoted text is that constitutional rights *do* exist by the time a parent has established an enduring relationship with his or her biological child.

7

F.     Conclusion

On these facts I would require a far greater showing before denying a father legal parenthood of his biological daughter, whom he supports, lives with, and raises. I respectfully dissent from the court's contrary conclusion.


_____

Poochigian, Acting P.J.