Filed 1/3/22  Marriage of B.S. and S.S. CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| In re the Marriage of B.S. and S.S. | D077728 |
| B.S., | |
| Respondent, | (Super. Ct. No. 18FL010584C) |
| v. | |
| S.S., | |
| Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, William J. Howatt, Jr., Temporary Judge.  (Pursuant to Cal. Const., art. VI, § 21.)  Motion to dismiss appeal denied; order affirmed.

Stephen Temko for Appellant.

Bickford Blado & Botros and Andrew J. Botros for Respondent.

Appellant S.S. appeals from an April 2020 order on his request to modify and reduce child and spousal support to respondent B.S.  The family court reduced combined support from $40,000 per month to $15,000 per month, including an upward deviation of child support from the guideline $7,367 amount to $10,000 based on the parties' children's various needs.  The

court declined to make its order retroactive to the date S.S. filed his modification request. S.S. contends the court reversibly erred by these rulings because he did not have the actual income to pay the ordered support, and the court failed to adequately consider his inability to pay given his litigation costs and living expenses.

B.S. moves to dismiss S.S.'s appeal under the equitable disentitlement doctrine, which gives an appellate court the ability to stay or dismiss the appeal of a party who has refused to obey court orders. (*In re Marriage of Hofer* (2012) 208 Cal.App.4th 454, 459; *United Grand Corp. v. Malibu Hillbillies, LLC* (2019) 36 Cal.App.5th 142, 166.) We elect to address S.S.'s appeal, and thus deny B.S.'s motion. On the merits, we affirm the order.

FACTUAL AND PROCEDURAL BACKGROUND[1]

S.S. and B.S. were married in 2001 and had three children during the marriage. In September 2018, while the children were minors, B.S. petitioned for dissolution of the marriage and sought a domestic violence restraining order. On the day B.S. served her petition, S.S. transferred to his

---

[1] We state some of the background facts from uncontested factual findings in the family court's detailed ruling on S.S.'s modification request.

2

mother $3 million out of a bank account he owned jointly with his father.[2] The parties eventually entered into a stipulation to appoint Judge William Howatt as a privately compensated temporary judge in their matter. According to financial documentation and information S.S. provided to his expert accountants, he does not receive a salary; his primary source of income is distributions from his ownership interest in five hotel properties held in separate limited liability companies (LLCs).[3] S.S. primarily invests in hotel properties with the plan to upgrade and refinance them, then make

[2]    S.S.'s expert Brian Bergmark testified that that account, No. 5388, was opened with $2 million of which Bergmark allocated $1.7 million to S.S. and $300,000 to S.S.'s father.  As of the date of S.S. and B.S.'s separation, the account had $5 million; $2 million was paid to one hotel limited liability company (New Albany Hospitality) and $3 million was transferred to S.S's father.  Bergmark testified that S.S.'s father received more than the father had put into the account due to money that S.S. owed him.  Bergmark testified he verified the loans through check copies and bank statements. According to him, since separation, S.S. had borrowed approximately $1 million from his father.  On cross-examination, Bergmark admitted he had not provided backup documentation to counsel for these loans, there were no promissory notes reflecting them, and it was S.S. who gave him a written summary and told him he had received various loans from his father.  S.S. also was the source of what S.S. claimed were pages of his father's bank statements reflecting the payments.

[3]    S.S. identified the various LLCs in an August 2019 declaration.  In a February 2019 declaration, S.S. stated:  "My father and I are business partners in the hospitality industry.  Our limited liability companies acquire properties that we develop and sell in the hotel and restaurant industry.  I receive intermittent seasonal distributions, some of which is non-distributable (phantom) income on which I am required to pay income taxes. Historically, when a seasonal distribution was received it was deposited into our community savings account and used to pay our monthly family expenses which averaged $20,000-$25,000 per month.  Until our September 2018 separation, these funds were sufficient to maintain our family standard of living."

distributions to himself and his partners after the properties are fully leveraged and sold. His primary income is from the distributions from the hotels' operation through his investment in an LLC with another individual.[4]

In early July 2019, Judge Howatt considered S.S.'s request for order regarding temporary child and spousal support, which was the subject of a prior order by another superior court judge. Finding the court had made several errors in its prior support order, Judge Howatt ordered that S.S. pay temporary child and spousal support of $25,000 and $15,000 per month respectively, retroactive to July 1, 2019. It ordered the erroneous prior order for $70,000 in monthly combined child and spousal support corrected to $40,000 per month retroactive to March 1, 2019, "with all arrears payable forthwith."[5] In reaching his decision, Judge Howatt calculated guideline child support to be approximately $10,000, but found an increase to $25,000 was appropriate based on the marital standard of living, S.S.'s "past ability [to pay], if not present income available for support" and the children's best interests.

On August 1, 2019, S.S. filed another request for order relating to child and spousal support. He asked the court to modify child and spousal support downward "based on [his] actual earnings, B.S.'s ability to earn working full time, and [their] respective timeshare with the children." According to S.S., his yearly taxable income from 2013 to 2018 fluctuated greatly for various

---

[4] Bergmark explained that S.S. and the others were "using capital and equity from one property and financing that property and putting it into other properties in order to make acquisitions or make these improvements . . . ."

[5] Judge Howatt's order was signed and filed later in August 2019, after S.S. on August 1, 2019, filed the request for order that is the subject of the present appeal.

reasons. S.S. claimed his 2018 monthly income averaged $30,252 and his 2019 average monthly income from LLC distributions was $42,824. Asserting he was living with his parents because he could not afford his own housing, he outlined his estimated living expenses from September 2018 to July 2019. S.S. asked the court to impute income to B.S., a radiologist with the asserted potential to earn over $500,000 per year based on her ability to work full time. In responsive and supplemental declarations, S.S. claimed he had been forced to borrow money from his father to pay court-ordered support. He stated he had $34,000 in a bank account and $77,177 in an investment account, with no ongoing income. S.S. pointed to his expert's conclusion that his "normalized" monthly earnings were $35,095, noting that the figure was similar to that given by B.S.'s forensic CPA Brian Brinig, who opined based on information for 2015 to 2018 S.S.'s average monthly income available for support was $35,788. In a November 2019 income and expense declaration, S.S. claimed average monthly expenses of $43,972.[6] He accused B.S. of misrepresenting the amount of funds available to her as well as her need for spousal and child support.

S.S. admitted he did not pay the court-ordered child and spousal support for January, February and March 2020. In February 2020, he submitted an updated income and expense declaration in which he again listed his expenses as $1,615 in uninsured healthcare costs; $126 in groceries and household supplies; $565 for eating out; $240 in cell phone and telephone

_____

[6]    S.S. listed his expenses as $1,615 in uninsured healthcare costs; $126 in groceries and household supplies; $565 for eating out; $240 in cell phone and telephone expenses; $33 in laundry and cleaning; $700 in clothing; $3,100 in education expenses; $5,000 in entertainment, gifts and vacation expenses; $1,931 in automobile and transportation expenses; and $28,062 in litigation costs. He claimed he paid $2,600 per month to a housekeeper as an installment payment or debt.

expenses; $33 in laundry and cleaning; $700 in clothing; $3,100 in education expenses; $5,000 in entertainment, gifts and vacation expenses; $1,931 in automobile and transportation expenses; and $28,062 in litigation costs. He claimed he paid $2,600 per month to a housekeeper as an installment payment or debt. He reported paying his attorneys approximately $807,073.25 as of February 2020, asserting he paid the fees and costs with loans from his parents.

In March 2020, the court conducted a hearing on S.S.'s August 2019 request. It took evidence from S.S.'s and B.S.'s expert CPAs Bergmark and Brinig, who had issued reports before the hearing. Both experts testified to S.S.'s available income to pay support.

Bergmark testified that his income analysis for S.S. looked at cash flows generated from hotel operations and distributions, as well as the level of debt; he testified that S.S. had told him, however, that he did not believe he could get any additional refinances, causing concern about his cash flow. S.S. told Bergmark there would be declining revenues unless they commenced a property improvement plan (PIP) on a hotel; Bergmark also testified about market disruptions including the Covid-19 pandemic. Bergmark's summary analysis of S.S.'s income "normalized" the monthly cash flow amounts, meaning he looked at all of the businesses' and operations' historical numbers, used time periods most representative, and came up with the best indication of ongoing yearly earnings for each entity, then divided them by 12. These normalized earnings constituted Bergmark's opinion as to S.S.'s income available for support.

Bergmark also traced incoming and outgoing funds from various bank accounts. This tracing included sales proceeds from a joint restaurant business, from which S.S. received $700,000 in January 2019. S.S. deposited

half of the proceeds back into an account for one hotel LLC jointly owned by him and his father (New Albany Hospitality, LLC, or New Albany), and $350,000 into another account, from which S.S. paid $350,000 in federal income tax payments. (The court later found this was an overpayment, resulting in a refund of $307,478 to S.S., which S.S. deposited into his personal bank account.) Bergmark explained in part that he understood from S.S. that some of the payments to S.S.'s father were loans, which Bergmark concluded amounted to $1,030,087. Bergmark admitted he saw no promissory notes or any other documentation to substantiate the loans; he relied only on what S.S. told him. S.S. gave Bergmark a paper purporting to be a summary of the loan activity; Bergmark did not prepare it and S.S. told him what the interest rate was. S.S. also provided Bergmark select pages purporting to be his father's bank account records. One account in particular, No. 5388, was opened in May 2017 with $2 million from an account held jointly by S.S. and B.S., but Bergmark allocated $1.7 million to S.S. and $300,000 to S.S.'s father due to their respective property ownership interests. As of the date of separation in September 2018, the account held $5 million, but $2 million was transferred to New Albany, and the other $3 million was paid to S.S.'s father, assertedly to repay loans.

S.S. and B.S. testified. S.S. explained his hotel ownership interests and his work, describing himself as "money manager" who made decisions "to input dollars or not put dollars in a particular investment and . . . try to manage and mitigate all the risks from ownership." He testified his father was an investor, and another individual managed the hotel property improvement plans (PIPs), day to day operations, bank accounts, and bills. S.S. admitted purposely submitting factually inaccurate asset and liability information to banks for the purpose of getting loans; he testified it was

7

"common" to overstate assets and understate liabilities. In January 2020, he sold his interest in New Albany to his father, and testified he received between $500,000 and $1 million in cash, which he deposited back into the bank account of another hotel property to go toward a PIP. S.S. admitted he last paid court-ordered monthly $40,000 in child and spousal support in December 2019, claiming he was unable to make the January, February, and March 2020 payments.

B.S. testified about her employment history up to and after the time of separation, as well as her obligations with respect to the children's medical and behavioral issues and the frequent appointments they had with various physicians. B.S. testified that she did not consent to the sale of the restaurant business or how S.S. distributed the $700,000 in proceeds. She did not see a court order permitting the sale of New Albany; she did not agree to New Albany's sale or how the sales proceeds were distributed. She did not consent to $5 million being taken out of account No. 5388 and disbursed in the manner S.S. did. In a February 2019 declaration, she asserted a balance sheet showed they owned $63 million in assets.

The family court made extensive findings in its modification ruling.[7] It observed that B.S. did not factually contest that there had been a material change of circumstances. It found S.S. was presently four months behind on his support obligations to B.S. and the children "because he abruptly stopped paying support in January 2020." At the same time, it observed that S.S. had paid his attorneys over $806,000, while B.S. had paid hers approximately $274,000; an over $500,000 difference.

---

[7]     The family court's April 29, 2020 order also addressed S.S.'s motion to compel further answers to special interrogatories, B.S.'s request for one-half of a 2018 tax refund, and B.S.'s request for attorney fee contributions from S.S. None of these matters are at issue in this appeal.

The court stated that S.S., who was living with his parents, estimated his monthly income to be $42,824 per month for the year 2019 based upon available distributions. It found: "Forensic analysis by Brian Bergmark and Brian Brinig of [S.S.'s] 'Income Available for Support' is very consistent in recognizing that historically S.S.'s income is predicated upon the amount of distributions from his hotel property partnership interests. . . . [S.S.] earns $44,740 per month. . . . [¶] Mr. Bergmark's analysis is based exclusively upon information supplied by [S.S.] This is significant when consideration is given to loan applications which [S.S.] has manufactured and contain false information regarding net worth."

The court essentially found S.S.'s testimony about his finances to be not credible: "At first [S.S.] stated he did not fill out these forms, and then admits he filled them out but 'everybody' in the industry submits inflated numbers and that is a common practice. A lie is still a lie. A false statement of wealth or assets in order to obtain a loan can also be determined to be fraud. Importantly, while he would not admit that he lied when filling out these forms he did admit that he put false numbers into the form as well as leaving out debt obligations he now claims [are] due to his parents. It cannot be a mystery that the court is suspect of [S.S.'s] testimony and allegations in this case regarding his financial situation."

The family court also found it important that S.S. had control of the community assets and bank accounts. Given this, the court found the record lacked a satisfactory explanation or reason for S.S.'s transfer of $3 million to his mother, assertedly to repay a loan to his father, on the same day B.S. served him with her dissolution petition. The court recited its calculations for its guideline support. It then explained the factors it used to deviate from

9

the guideline amount: "[S.S.] has [committed],[8] after trial . . . domestic violence including acts of physical, psychological and financial abuse of [B.S.] [One of their daughters] was of sufficient age and understanding to observe and be severely psychologically affected by [S.S.'s] actions toward [B.S.] Both [of the other children] have suffered the effects of domestic violence as well. . . . [Their son] who is a special needs child functions admirably but slowly and needs tutorial assistance to complete his studies. [¶] It is undeniable that [S.S.'s] lack of anger management and self-control ha[s] brought this family to the brink of financial and emotional disaster. [¶] Actual domestic violence can be a factor which the court may seriously consider in setting a support amount. . . . [¶] Deviation from guideline for the benefit of the children is truly justified. [¶] In order to sustain the tutorial and therapeutic needs of all three children, and to meet the special needs of [their son], Child Support is set at $10,000 per month. [¶] While [B.S.] has suffered greatly from the domestic violence and abuse the court does not feel, under the circumstances where [S.S.] is alleging lack of ability to pay any support that it is appropriate to order other than the guideline suggested spousal support."

The Court addressed S.S.'s request for retroactivity to August 1, 2019, as follows: "When making a modification to a child and spousal support order, the court may consider making the modification retroactive to a date certain, generally to the date of the filing of the motion. [¶] . . . [¶] The court has direct statutory authority and discretion to make a modification of an order for child support retroactive. ' . . . An order modifying or terminating a support order may be made retroactive to the date of the filing of the notice of motion or order to show cause to modify or terminate or any

---

8 The court's ruling states that S.S. was "convicted" of domestic violence, but B.S. concedes that he was not convicted of any crime.

10

subsequent date . . . .' [¶] This is a discretionary determination to be made by the trial court. There are no specific statutory guidelines by which the court is to make a decision on retroactivity. . . . [R]etroactivity is generally made in consideration of the supporting party's ability to pay and the other party's need." Acknowledging the strong policies behind awards of adequate child support, the court ruled: "Giving consideration to the specific needs of the children as well as [B.S.] as victims of domestic violence either directly in [B.S.'s] situation or psychologically . . . as children observers it is appropriate in looking to the equities of the situation to deny retroactivity as requested by [S.S.]"

The court continued: "In addition to the effects of [S.S.'s] anger and abuse there is the lack of credibility in his testimony regarding disposition of millions of dollars of community monies on claimed but unverified 'loans' from his parents as well as his fictitious statements of net worth on multiple loan applications. The predicate for Mr. Bergmark's income analysis is again based exclusively upon documentation and personal explanation of [S.S.]. The facts, circumstances and equities of the case do not warrant retroactive application of the support awards. [¶] Additionally, [B.S.] had a right to expect and rely upon the previously ordered child and spousal support pending this hearing. [¶] The request for retroactively effective child and spousal support is denied for the reasons stated." (Some capitalization omitted.) On B.S.'s later request for clarification, the family court ruled that its modification order was effective as of April 28, 2020, and not retroactive.

## DISCUSSION

### I. *Motion to Dismiss Under Disentitlement Doctrine*

B.S. has moved to dismiss this appeal under the disentitlement doctrine, under which a court has the inherent discretionary power to dismiss

11

an appeal where a party refuses to comply with lower court orders (see *Stoltenberg v. Ampton Investments, Inc.* (2013) 215 Cal.App.4th 1225, 1229; *Foster v. Sexton* (2021) 61 Cal.App.5th 998, 1036, fn. 12; *United Grand Corp. v. Malibu Hillbillies, LLC, supra*, 36 Cal.App.5th at p. 166) or has engaged in " 'obstructive tactics.' " (*Menezes v. McDaniel* (2019) 44 Cal.App.5th 340, 346.)  " 'The rationale underlying the doctrine is that a party to an action cannot seek the aid and assistance of an appellate court while standing in an attitude of contempt to the legal orders and processes of the courts of this state.' " (*Ibid.*; *Stoltenberg*, at p. 1230; *In re Marriage of Hofer, supra*, 208 Cal.App.4th at p. 459.)

According to B.S., despite the court's orders to pay monthly support, S.S. has not made a single child or spousal support payment since December 2019, and he presently has $220,000 in child support arrears alone, before interest.  She points out that on appeal, S.S. does not challenge the actual guideline child support of $7,367 per month, only the court's upward deviation to $10,000, characterizing S.S. as "conced[ing] that he should be paying $7,367 per month."  She also points out that in his February 2020 income and expense declaration, S.S. declared he was spending $5,000 per month on entertainment, gifts, and vacation, and $2,600 per month on a housekeeper, and he represented that between November 2019 and February 2020, he had paid his lawyer over $117,000 in attorney fees.  B.S. asserts S.S. also owes $112,623 in spousal support arrears and has never paid child care expenses and uninsured healthcare costs as court-ordered additional child support.  She asserts that in 2020 and 2021, S.S. filed lawsuits against her in Tennessee, Florida, Kentucky and Indiana, and an unsuccessful writ petition in this court in September 2020, all while not paying support.  According to B.S., S.S.'s bank statements reflect that between December 13, 2019, and

April 23, 2020, he had made over $365,000 in cash deposits into his personal checking account and he continued to incur substantial credit card charges through March 2021, which he paid off monthly.

In opposition, S.S. does not deny he failed to pay support; he maintains that due to the Covid-19 pandemic, his hotel business rendered him unable to comply with child and spousal support after December 2019. He states the proceeds from the sale of one of his cars went "mostly" to arrears, and proceeds from the community house are now held in trust until the parties' counsel can meet and confer about the disputes over the precise amount of arrears. According to S.S., he has not willfully violated the court's orders to pay support; rather, he lost the sole source of his income. In an accompanying declaration, S.S. asserts he had no hotel profits in January through March 2020, and thus his failure to make support payments in January and February 2020 was not willful. He argues B.S. has not provided proof of his ability to pay the support amounts; she ignores the consequences of the pandemic as well as later orders reducing support to zero in October 2020, and she does not give him credit for payments she received.

" ' "Appellate disentitlement 'is not a jurisdictional doctrine, but a discretionary tool that may be applied when the balance of the equitable concerns make it a proper sanction . . . .' [Citation.]" [Citation.] No formal judgment of contempt is required; an appellate court "may dismiss an appeal where there has been *willful disobedience or obstructive tactics.* [Citation.]" [Citation, italics added.] The doctrine "is based upon fundamental equity and is not to be frustrated by technicalities." ' . . . [¶] The 'disentitlement doctrine "is particularly likely to be invoked where the appeal arises out of the very order (or orders) the party has disobeyed." ' [Citation.] '[T]he merits of the appeal are irrelevant to the application of the doctrine.' " (*United*

13

*Grand Corp. v. Malibu Hillbillies, LLC*, *supra*, 36 Cal.App.5th at p. 166; *Ironridge Global IV, Ltd. v. ScripsAmerica, Inc.* (2015) 238 Cal.App.4th 259, 265.) Dismissal of an appeal under the disentitlement doctrine is an equitable remedy subject to our discretion. (*Ironridge Global IV*, at p. 265.)

"The power to dismiss an appeal for refusal to comply with a trial court order has been exercised in a variety of circumstances, including: where a parent had taken and kept children out of the state in violation of a divorce decree [citations]; where a husband had failed to pay alimony as ordered in an interlocutory judgment of divorce [citation]; where a party in a civil action was a fugitive from justice and in contempt of the superior court for failure to appear on criminal charges after being released on bail [citations]; and where defendants willfully failed to comply with trial court orders regarding a receivership. [Citation.] Moreover, the inherent power to dismiss an appeal has been exercised in several cases where a party failed or refused to appear for a judgment debtor examination." (*TMS, Inc. v. Aihara* (1999) 71 Cal.App.4th 377, 379-380, citing in part *Kottemann v. Kottemann* (1957) 150 Cal.App.2d 483.) In *Kottemann*, the appellant, a certified public accountant, made repeated efforts to thwart his spouse's ability to enforce an alimony judgment: he closed bank accounts and transferred assets on which she attempted to execute, secreted himself to avoid a deposition, and lied about the extent of his ownership in certain stock. (*Kottemann*, at pp. 484-488.) In dismissing the appeal, the appellate court observed it was "clear" that the appellant "intends to frustrate plaintiff's efforts to obtain the fruits of her judgment and [an] attorney fee award" and it "cannot be gainsaid" that he "entertains an intention to defraud her . . . ." (*Id.* at p. 488.)

We do not take lightly the undisputed fact that in January 2020, S.S. "abruptly" stopped paying court-ordered child support that is the subject of

14

this appeal (as well as spousal support and other child care expenses). The duty of a parent to support his or her children is a fundamental parental obligation (*Moss v. Superior Court* (1998) 17 Cal.4th 396, 405) and must be according to the parent's circumstances, station in life, and ability. (Fam. Code, § 4053, subds. (a), (d).) B.S. has shown that S.S. submitted income and expense declarations showing that after he stopped paying support he continued to pay extraordinarily large monthly personal expenses ($7,600) toward "gifts, entertainment, and vacation" or housekeeping and made substantial payments to his attorneys in the months before and after January 2020. Though the court in May 2020 granted him some relief from spousal support obligations, it expressly ordered that he "continue to pay the existing Child Support Orders," which he did not. All of this, combined with S.S.'s suspicious and inadequately-explained transfers of large sums of money to his parents and his abject dishonesty on loan applications, which he sought to downplay at trial and the family court relied on to reject his credibility, could warrant dismissing this appeal. On the other hand, S.S. has shown that as late as June 2021, the parties' attorneys continued to negotiate how to pay child and spousal support arrears from funds held in trust and how much of the proceeds from community assets would go toward them. According to counsels' e-mails, as of October 1, 2020, the California family court no longer had jurisdiction over child support and jurisdiction over child support beyond that period rests in Florida.

We elect to reach the merits, and address the appeal without applying such an extreme sanction. (See *In re E.E.* (2020) 49 Cal.App.5th 195, 207.) The right to an appeal " 'must not be lightly forfeited, and where a doubt exists as to a litigant's conduct being contumacious or willful, an appellate court will tolerate temporarily the acts which were disruptive of the judicial

15

process. We always prefer to resolve a cause on its merits; once the rights of the parties have been determined with finality, then the thwarted authority and offended dignity of the court may be assuaged with condign sanctions to the extent of the affront.' " (*Stoltenberg v. Ampton Investments, Inc.*, *supra*, 215 Cal.App.4th at pp. 1231-1232.)

## II. *Upward Departure from Guideline Child Support*

S.S. contends the family court erred by using the four-year average of his income to deviate upward from the $7,367 guideline monthly amount of child support to $10,000 per month.[9] He acknowledges that the court's reason for deviating was his children's special needs, and admits that under Family Code section 4320, subdivision (i), " '[a]ctual domestic violence can be a factor which the court may seriously consider in setting a support amount.' " Nevertheless, S.S. purports to recite a litany of "facts" including misstating his own testimony concerning the impact of the Covid-19

---

[9] S.S. does not contest the family court's calculation of guideline child support at $7,367, based on S.S.'s $44,740 monthly income available for support, the determination of which was subject to considerable court discretion. (See Fam. Code, § 4058, subd. (a)(1), (2) [annual gross income is income from whatever source derived, including income from the proprietorship of a business, such as gross receipts reduced by required expenditures for the business's operation].) The court adopted Bergmark's conclusion of S.S.'s normalized monthly earnings, which had already taken into account the fluctuations in revenue. As we state (fn. 10, *post*), S.S. agreed with his own expert's assessment of his monthly income available for support.

pandemic on the hotel business,[10] with the apparent goal of demonstrating the past four years of average or normalized income would not reoccur and he is unable to pay the increased $2,633 per month in child support. He argues the court's upward deviation "did not reflect the reality of the future" and "[w]ith negative income, [S.S.] had barely enough to live on especially considering he was still under court orders (after the first $50,000) to pay litigation expenses." S.S. compares his situation to cases, including *In re Marriage of Riddle* (2005) 125 Cal.App.4th 1075, in which the appellate courts reversed child support orders that exceeded the payor spouse's ability to pay.

"An award of child support rests in the court's sound discretion and cannot be overturned absent a showing of a clear abuse of discretion. 'An appellate court does not substitute its own judgment; rather it interferes only if no judge could reasonably have made the order under the circumstances.'" (*In re Marriage of Hubner* (2001) 94 Cal.App.4th 175, 184; *In re Marriage of Bodo* (2011) 198 Cal.App.4th 373, 384.) Under this standard, we " 'examine

10    In his brief, S.S. asserts as a "fact" that it was "obvious the past four years average would not occur given the Covid 19 outbreak. [Hotel] [b]ookings were already down, in early March, for April May and June, 2020." In fact, at the cited portion of the record, S.S. testified that he agreed with Bergmark's assessment of his income available for support. He then explained that he could manage certain risks, but "[w]hat I cannot manage, what I cannot guarantee is that a coronavirus, which has already affected our bookings in April, May and June—if that keeps playing out, what will that mean to our income for the full year 2020? There are certain risks I can only mitigate, but I cannot guarantee you that that's the way will work out [*sic*]." Not only did S.S. not directly testify that bookings went down, he stated he could not say what the pandemic would mean for his 2020 income. Additionally, S.S. claims the court acknowledged his monthly expenses were $42,972 including $28,062 in monthly litigation expenses, but in fact the court merely stated he had *listed* such expenses and did not make any finding on S.S's litigation expenses.

17

the evidence in the light most favorable to the prevailing party and give that party the benefit of every reasonable inference.  [Citation.]  We accept all evidence favorable to the prevailing party as true and discard contrary evidence.  [Citation.]'  [Citation.]  'We do not reweigh the evidence or reconsider credibility determinations.' " (*In re Marriage of Calcaterra & Badakhsh* (2005) 132 Cal.App.4th 28, 34.)  "We are not called upon to determine whether we would have made such an award, but whether any judge could reasonably have done so." (*In re Marriage of de Guigne* (2002) 97 Cal.App.4th 1353, 1365-1366; *In re Marriage of Aylesworth* (1980) 106 Cal.App.3d 869, 876.)  Further, the lower court's order is presumed to be correct on appeal and S.S. as the appellant bears the burden of affirmatively demonstrating error. (*In re Marriage of Oliverez* (2019) 33 Cal.App.5th 298, 311-312; *IIG Wireless, Inc. v. Yi* (2018) 22 Cal.App.5th 630, 639.)

S.S. has not met that burden.  Notably, he does not challenge the underlying factual basis for the court's diversion upward, namely the children's special needs expenses necessitated, in part, by his acts of domestic violence.  Rather S.S.'s arguments attempt to attack the court's use of the time period of income, and view the evidence in the light most favorable to him.  While he acknowledges elsewhere that the court discounted his credibility, he fails to recognize that this means the court was within its discretion to reject S.S.'s claims about loans from his father, as well as Bergmark's tracing analysis (all based on S.S.'s representations) so as to conclude S.S. had access to large sums of money available for support that he improperly transferred to his father. (Accord, *In re Marriage of Chakko* (2004) 115 Cal.App.4th 104, 110 [upholding trial court's rejection of business owner's "structuring of income and expenses" as "an attempt to minimize child support obligations," concluding "[f]ather fails to appreciate the rules on

18

appeal concerning substantial evidence and abuse of discretion. He fails to understand that the trial court did not credit his testimony"].) The court was not required to accept those portions of Bergmark's analysis. (*In re Marriage of Greenberg* (2011) 194 Cal.App.4th 1095, 1099 [trial court "sits as trier of fact" and is " 'sole judge of the credibility and weight of the evidence' "]; see *In re Marriage of Calcaterra & Badakhshi, supra*, 132 Cal.App.4th at p. 36 [trier of fact is entitled to accept or reject any part of a witness's testimony].) The court found S.S. lied about his financial condition to banks so as to inflate his worth for the purpose of getting loans, but this permitted the court to infer that S.S. was likewise dishonest in his claim of reduced or no funds available for support. (Accord, *Marriage of Calcaterra*, at pp. 35-36 [trial court was entitled to use father's gross rental income without deducting expenses for his monthly income due to its finding that father lied about his income and expenses].) The various transfers and lack of credibility in S.S.'s testimony as to his financial condition distinguishes this case from those in which appellate courts reversed support orders based on unrepresentative periods of earnings. (Compare, *In re Marriage of Riddle, supra*, 125 Cal.App.4th at pp. 1082-1084 [court abused its discretion by using two months of husband's income to calculate child and spousal support where he was a financial advisor with an unusual compensation arrangement].)

Rather, this case is akin to *In re Marriage of Calcaterra & Badakhshi, supra*, 132 Cal.App.4th 28, where the court was not required to accept the appellant father's assertions as to his income and expenses, or *In re Marriage of Kirk* (1990) 217 Cal.App.3d 597, in which the party made a "contractual shift of disposable income" from funds available for child support to the repayment of third party debt, from which the family court reduced the party's child support obligation. (*Id.* at pp. 601, 606.) The appellate court in

*Marriage of Kirk* held such a shift of funds was impermissible: " 'A parent's first and principal obligation is to support his or her minor children . . . .' [Citation.] 'All payments of support shall be made by the person owing the support payment prior to the payment of any debts owing to creditors.' [Citation.] '[A]n indebted parent cannot escape liability for the paramount obligation to support the parent's children because of indebtedness such parent has created.' " (*Id.* at p. 606.) Though the court in *Kirk* observed there was "nothing to suggest that this obligation was sham, unenforceable or undertaken as a ruse to avoid child support," it held the record "impels the conclusion that the contract was voluntarily entered into by [the former husband] in the face of a preexisting child support obligation which the new contract was bound to undermine." (*Ibid.*) The family court's error was "in failing to consider that the only rational inference derivable from the paperwork before the court was that this shift was a voluntary diversion of income to pay debt, resulting in deprivation of funds for child support. The law does not permit this. Were we to sanction this sort of transaction we can envision all manner of special contracts, with employers or others who owe money to a supporting parent, which shift funds from available income to utilization for other purposes benefiting the parent (such as savings plans, retirement plans, miscellaneous fringe benefits), resulting in the contention that the support order must be reduced." (*Id.* at p. 607.)

The circumstances here do permit an inference that S.S. shifted income as a sham or ruse to avoid obligations that he knew would arise[11] given B.S.'s filing of a petition for dissolution. The trier of fact may reject even

---

11 The court found S.S. is "highly educated and has credentials as a Certified Public Accountant and a Juris Doctor degree although he has never practiced as a lawyer."

20

uncontradicted evidence as not credible. (See *Sprague v. Equifax, Inc.* (1985) 166 Cal.App.3d 1012, 1028.) Under the circumstances, there was little reason for the trial court to find anything S.S. said about his finances credible. As stated, it is not for us to revisit the award, but to merely decide whether no judge could reasonably have made the order that this family court did. On this record we cannot say that is the case.

### III. *Refusal to Retroactively Apply the April 2020 Order*

S.S. contends the court reversibly erred by failing to make its modification order retroactive because while it considered the children's needs, it did not adequately consider his inability to pay, which he states is "outcome determinative." S.S. maintains the court focused only on the children's needs, and not his ability to pay and lack of income. S.S. argues: "The evidence showed that [S.S.] did not have income to pay $40,000 a month in combined spousal and child support during the retroactive period and he did not have the ability to pay arrears while at the same time support himself and pay ongoing support." S.S. acknowledges that the court found him not credible as to his financial situation and the multiple fictitious loan applications, but claims "there was no evidence, from anybody, including the forensics that [S.S.] had hidden assets, the ability to pay[ ] over $200,000 in after tax dollars." S.S. cites authority for the propositions that a finding a party lacks credibility is not affirmative evidence of a contrary conclusion, and that speculation is not substantial evidence.

We review for abuse of discretion the court's decision whether to make a child support order retroactive. (*In re Marriage of Leonard* (2004) 119 Cal.App.4th 546, 555.) Again under this standard, we view the evidence in the light most favorable to B.S. and give her the benefit of every reasonable inference, accepting all evidence favorable to her as true and discarding

21

contrary evidence.  (*In re Marriage of Calcaterra & Badakhsh*, *supra*, 132 Cal.App.4th at p. 34.)  We do not reconsider the court's credibility determination that S.S. was untruthful in connection with his financial circumstances.  Because S.S.'s argument on retroactivity rests on the same foundation as his challenge to the court's modification order—his asserted lack of funds and inability to pay—our conclusions above dispose of his argument.

DISPOSITION

The order is affirmed.

O'ROURKE, J.

WE CONCUR:

HUFFMAN, Acting P. J.

DO, J.